

585 East 222nd Street, Euclid, OH 44123-2099

THE LAKEFRONT CITY
OF SUPERIOR SERVICES

*EUCLID POLICE DEPARTMENT*
**Scott Meyer**
*Chief of Police*
545 East 222nd Street
(216) 289-8513
Fax: (216) 289-8327
email: smeyer@cityofeuclid.com

09-26-17

Reference:     **Luke Stewart EPD Shooting Investigation Team Report**

**EPD Incident #17-01820 / 03-13-2017**

I have reviewed the Shooting Investigation Team Report and concur with the findings.  I find no violations of Euclid Police Department Policy & Procedures and/or Rules & Regulations as it pertains to the use of force, to include the use of deadly force.

The only Policy & Procedure violation that occurred during this tragic incident was the non-activation of the Mobile Dash Camera systems in both marked EPD police vehicles directly involved in this incident.  Neither P.O. M. Rhodes #39 (car #20) or P.O. L. Catalani #47 (car #1) manually activated their Mobile Dash Camera systems prior to approaching Luke Stewart's automobile on this suspicious vehicle call.

Euclid Police Department Policy/Procedure #440 – Mobile Video, section XIII, section C.  states the following:

> *The mobile video system will be used during all enforcement and investigative contacts when those contacts are in sufficient proximity to the police vehicle to obtain sound and video.  The system may be used to provide audio recordings of officer contacts in circumstances that do not permit video recording.*

Both officers would have had to have activated the systems manually as neither had activated their overhead lights.  The activation of the overhead lights will automatically activate the camera system, assuming the system is working properly.  The decision to not activate the overhead lights in this type of situation was a sound, tactical and practical decision, as these lights can startle and alarm those "passed-out" at the wheel and cause them to lurch forward and/or to accelerate dangerously out of control. This is a common practice and it is a good safety practice.



PLAINTIFF'S
EXHIBIT
# 19
Meyer 6/21/18

1

EUCLID DOC 1125

For a number of reasons, the manual activation of the Mobile Dash Camera system by members of the Euclid Police Department has not been the common practice on calls such as this.  To activate the system manually, the user must consciously remember to switch the system to the "record" position while directing their attention toward whatever object and/or person(s) they are going to address.  It has become apparent, that most members of this police department are/were unaware of the required manual activation of the system, particularly in situations dealing with calls for service pertaining to suspicious automobiles.  I had to review Policy & Procedure #440 to reacquaint myself with all of the particulars.  Additionally, prior to this incident, our fleet of Mobile Dash Cameras were not working properly on a regular basis.  Members of the Euclid Police Department had little confidence that the systems would record and/or download video on a consistent basis.  Without an in-house tech support employee this became more and more of a problem.  With the help of subcontracted, as needed tech support, this situation has since been mitigated (not eliminated).

In order to make the members of the Euclid Police Department aware and compliant with Policy & Procedure #440, I have directed Training supervisor, Lt. M. Houser to make all of the members of the Euclid Police Department aware of #440, section XIII, section C.  This will be accomplished by all members signing off on a document acknowledging that they reviewed those sections.

Scott Meyer
Chief of Police 

2

To:     **Chief Scott Meyer**                                          09/20/17

Fr:     **Lt. Mitch Houser**

Re:     **Luke Stewart EPD Shooting Investigation Team Report**

        **Incident 17-01820:  March 13, 2017**

The Shooting Investigation Team has concluded the examination of incident 17-1820, in which Ptl. Matthew Rhodes #39 shot and killed Luke Stewart shortly after encountering Stewart on a suspicious vehicle investigation on March 13th, 2017.  The following is the investigation report:

### Narrative

I reviewed both the Attorney General BCI Prosecutor's Summary report and the Euclid Police Department Detective Bureau's parallel investigation.  Both reports coincide with one another and no facts are in dispute between those two reports.

At 0651 hrs on March 13th, 2017, Chagrin Valley Dispatch received a telephone complaint of an occupied suspicious vehicle idling in front of 21891 South Lake Shore Blvd.  Uniformed Patrol Officers Matthew Rhodes #39 and Louis Catalani #47 were dispatched to the call.  Catalani arrived first and pulled his cruiser behind the suspicious vehicle, a black Honda.  Catalani determined that the vehicle was occupied by one male, who appeared to be asleep or passed out behind the wheel.  That male, and sole occupant of the Honda, was later identified as Mr. Luke Stewart.  Rhodes arrived next and after a brief discussion with Catalani, decided to place his vehicle in front of the Honda so that the potentially impaired Stewart would not be able to drive off and jeopardize either himself or the public.

Both Rhodes' and Catalani's marked cruisers were equipped with mobile video camera systems.  Neither Officer activated his overhead lights, nor did they manually turn on their cameras or remote microphones during this incident.

After the cruisers were strategically placed, Catalani positioned himself by the driver's door, with Rhodes at the passenger door.  Catalani knocked on the Honda's window and woke up Stewart, who was reclining in the driver's seat.  Catalani waved at Stewart, who waved back at Catalani.  Rhodes heard Stewart say the word, "police" along with something else he could not understand.  Stewart then started the car and reached to put the car in gear.  Catalani began yelling, "No, no, no, stop, stop, stop" at Stewart.  Catalani reached into the opened driver's door of the Honda and physically struggled with Stewart in order to prevent him from getting the car into gear.  Catalani also tried to pull Stewart out of the Honda.  Rhodes partially entered the car from the passenger side and also struggled with Stewart in order to prevent him from placing the Honda in gear.  Rhodes also tried to force Stewart out of the driver's side door by pushing on him.

The Honda began moving, in gear.  Catalani stated that he moved alongside it in order not to be run over.  The Honda struck Rhodes' cruiser on the pusher bar.  It then made a left around the cruiser and traveled eastbound on South Lake Shore, towards East 222nd Street.  At the same time, a white SUV was traveling

1

westbound on South Lake Shore Blvd, directly towards Catalani, who was still moving alongside the Honda. In order to avoid being crushed between the white SUV and the Honda, Catalani physically disengaged from Stewart. The Honda continued eastbound and then paused at the intersection of South Lakeshore Blvd. and East 222nd Street before continuing northbound on East 222nd Street. At this point Catalani became aware that Rhodes was still inside the Honda.

Immediately after the onset of the struggle inside the Honda, Rhodes was partially inside the vehicle's opened front passenger door. As the Honda began to move forward, it struck Rhodes' cruiser. This collision knocked Rhodes off of his feet and resulted with Rhodes mostly inside of the Honda on the front passenger seat with his legs dangling outside of the passenger door. Stewart placed the car into reverse and created distance between the Honda and the cruiser and then began to drive forward around the cruiser. Rhodes feared that if he tried to get out of the Honda at that point, he would be crushed between the Honda and his own cruiser. Rhodes pulled his legs inside of the Honda as it drove eastbound on South Lake Shore Blvd., around and eventually past the cruiser.

Rhodes continued to struggle with Stewart in repeated attempts to place the Honda into park or neutral. Rhodes punched and struck Stewart multiple times in his face and jaw in order to gain physical control over Stewart, but the strikes were ineffective. Rhodes was able to shift the car into neutral multiple times, but Stewart was able to put it back into drive each time. This continued as the car moved eastbound on South Lake Shore Blvd. towards East 222nd Street.

When Rhodes realized that the subject control techniques and physical strikes were ineffective, he deployed his Taser X26 in an attempt to discharge the probes into Stewart and gain control of Stewart and the Honda. The Taser had an initial effect but the safety was inadvertently bumped into the "safe" position after initial deployment. Rhodes deactivated the safety and repeatedly pressed the trigger, but it did not have any apparent effect on Stewart. Rhodes then struck Stewart in the face with the Taser but was only able to take control over the Honda briefly before Stewart got it moving forward again.

The violent struggle continued inside of the Honda as it began to travel northbound on East 222nd Street. The vehicle traveled over the curb and onto the sidewalk, narrowly missing a light pole. As the vehicle continued, Rhodes was being bounced around inside of the passenger compartment. Rhodes believed if the Honda were to strike a light pole, another vehicle, or a building, he could be thrown through the windshield. The Honda could also strike a pedestrian. Having exhausted his use-of-force options, Rhodes decided to use his firearm to immediately stop Stewart by shooting Stewart with his duty pistol.

Rhodes drew his department-issued duty pistol and shot Stewart in the chest. The gunshots had no apparent effect on Stewart. Stewart then swung at Rhodes with his hand but Rhodes avoided the swing. Rhodes then shot Stewart again from a different angle. One round entered Stewart's neck and appeared to have an immediate effect. Stewart quickly stopped all physical resistance and slumped over in the driver's seat. Rhodes stopped shooting and the Honda came to rest on the tree lawn at the corner of Milton Avenue and East 222nd Street. This ended the use-of-force against Stewart.

Officers had been dispatched during roll-call and arrived quickly on scene. Rhodes was removed from the immediate area by fellow Officers. Immediate medical attention was provided by responding Officers and Euclid Fire Rescue was immediately called for Stewart. Stewart was unresponsive and later declared dead at

2

the hospital. An autopsy revealed that Stewart had died as a result of the gunshots from Rhodes. Rhodes was also examined for any injuries and no serious physical injuries were observed.

The Detective Bureau responded and secured the scene. Chief Scott Meyer made the determination to request BCI take over the scene and ultimately the investigation of the use of deadly force. The EPD Detective Bureau conducted a parallel investigation.

The EPD Shooting Investigation Team was notified. Chief Meyer decided that the SIT's investigation and subsequent report would be conducted and filed after BCI had concluded their investigation.

## Equipment and Training

Rhodes stated that he believed that he shot Stewart three times. BCI's investigation determined that Rhodes had shot Stewart four times. BCI collected four Speer 9mm Luger +P caliber spent bullet casings from inside the Honda. They were all forensically matched to Rhodes' duty pistol. Four bullets were recovered by BCI. Three were forensically matched Rhodes' duty pistol. One bullet was too deformed to determine an exact match to Rhodes' pistol, but showed corresponding characteristics to the other three bullets recovered and examined.

The location of the four spent casings indicate that all four of the shots were fired from inside of the Honda. The taser and gunshot wounds to Stewart's body and bullet damage to the interior of the Honda indicate that the taser and all four gunshots were fired from the right side of Stewart, going right to left. This is consistent with Rhodes' statement that he was fighting with Stewart from the passenger seat area while Stewart drove the Honda.

The duty pistol recovered from Rhodes was a 9x19mm caliber Glock model 17 semi-automatic pistol, s/n WCB541. It was issued to Rhodes and initially qualified to OPOTA standards on 8-15-16 (App. A, B, C). Rhodes had most recently qualified with that pistol to OPOTA standards on 09-13-16 at in-service training (App. D). During this in-service training, Rhodes also successfully completed an EPD Use-of-Force written exam (App. E). Rhodes was subsequently issued, and qualified to OPOTA standards, with a 9x19mm caliber Glock model 17 semi-automatic pistol, s/n WCB544, to replace the pistol seized during the investigation (App. B).

The recovered bullets, empty casings, and other unfired ammunition recovered from Rhodes' duty pistol were all 9mm Luger caliber Speer 124gr Gold Dot Hollow Point +P ammunition, which was the department-issued duty handgun ammunition at the time of the shooting (and currently is still the department's issued duty handgun ammunition). It should be noted that "9x19mm" caliber and "9mm Luger" caliber are different names for the same caliber and can be used interchangeably in this report.

During the shooting, Rhodes was carrying his back-up pistol, a 9x19mm caliber Glock model 26 semi-automatic pistol, s/n BCLK909. Rhodes had successfully qualified to OPOTA standards with that pistol on 8-30-16 and been granted approval for carry by former Chief Tom Brickman on 9-12-16 (App. C, F). The investigation determined that this pistol had not been fired during the incident.

The Taser used by Rhodes and subsequently recovered during the investigation was Taser model X26 s/n X00426051. The serial numbers of the deployed cartridge and the spare cartridge recovered during the

3

investigation were not recorded by BCI. Those cartridges, however, were consistent with those issued by the EPD for the X29 Taser. The recovered Taser is owned by the Euclid Police Department and had been signed out by Rhodes at the beginning of his shift (App. G). Rhodes had received Taser X26 qualification training on 3-12-09 while employed as a Police Officer with the Kirtland Hills Police Department and again on 2-15-10 while serving in the United States Army (App. H, I).

On 1-10-17 Catalani had attended in-service training that included 3 hours of subject control techniques (App. J-1,2). On 2-21-17, Rhodes attended the same training (App. K-1,2). This training included discussion of the use-of-force continuum as instructed by defensive tactics training Officers Paul Doyle # 11 and George Panagiotou #66. The attached continuum was copied directly from the approved lesson plan (App L).

### Summary

Procedure #441 (App M1-4) states that when a patrol vehicle is equipped with a mobile video system, it shall be used by the Officer throughout the tour of duty. It is also to be used during all investigative contacts when these contacts are in sufficient proximity to the police vehicle to obtain sound and video. Neither Officer utilized their mobile video systems.

Physical force was initially utilized in order to attempt to gain control over Stewart and stop the vehicle from moving. This initial attempt was unsuccessful and quickly led to Stewart ramming Rhodes' parked cruiser with Rhodes partially inside of the Honda. This, in turn, led to Rhodes struggling with Stewart inside the moving Honda as it drove off on South Lake Shore Blvd.

Subject control tactics, physical striking to the head and face, and Taser deployment were all unsuccessful in attempting to gain control over Stewart and stop the Honda. This led to Rhodes inside the Honda, unrestrained, as Stewart drove wildly on and off of the roadway. Rhodes' immediate fears were that (1) a crash would eject him through the windshield and (2) that another motorist or pedestrian would be struck by the Honda. Having expended all of his available lesser force options, Rhodes decided it was necessary to utilize deadly force in order to gain control over Stewart and stop the immediate serious physical and deadly threats to himself and the public.

The Shooting Investigation Team concludes that in light of the multiple threats posed by Stewart, Rhodes' use of force did not violate any department policy, procedure, or Chief's directive and was within department standards per Policy and Procedure #419 (App N1-12).

Respectfully Submitted,

Lt. Mitch Houser
Shooting Investigation Team Supervisor

4

## 2017 Vehicle CQB Agenda

Daily Agenda:

  08:00 - 08:30 : Safety Briefing & Use of Force Test
  08:30 - 10:00 : Qualifications (Patrol Rifle, Handgun, Shotgun)
  10:00 - 16:00 : CPT (VCQB/Force on Force/First Aid)

CPT Agenda:

  10:00 - 10:15 : Correct tourniquet application [self leg and buddy arm using proximal pressure]
  10:15 - 11:00 : Ballistic demonstration / VCQB Theory & Discussion [single pillar, stacking pillars, front to back window, and side windows]
  11:00 - 11:30 : Positional Drill [1: 1 headshot standing, 2: 2 high chest crouch, 3: 3 high chest kneeling, 4L or 4R: 4 groin urban prone]
  11:30 - 13:00 : Positional Drill using VCQB exterior fundamentals ["alphabet soup"] (dry fire and live fire, 1 and 2 trainees at a time)
  13:00 - 13:30 : Felony Traffic Stop demonstration using rear of car and vehicle ballistics
  13:30 - 16:00 : Force on Force - Felony Traffic Stop (Shoot and Don't Shoot Scenarios) & Gunfight between two trainees using points of cover on vehicle, self-aid/first-aid as needed upon scenario completion (tourniquet)



PLAINTIFF'S EXHIBIT
#20
PENGAD 800-631-6989

VERBAL CONFLICT OUTLINE (IN-SERVICE 2018)

# Presentation Outline

I.  Introduction – Verbal Conflict is A Fact of Life

   A. Goals of the Course and My Personal Message to You

   B. Don't Let Your Training Tape Run Out

     - *Traffic Stop* – Handling a tough case . . . cold!

   C. Become Less Dependent Upon "ATM" (Ask, Tell, Make,) and More Effectively Trained in the Use of Persuasion (Rhetoric), when Safety is not Compromised

   D. Subject Control Options Discussed During this Presentation

     - Subject Control Options **NOT** Focused on During this Presentation

   E. Officer & Citizen **SAFETY FIRST**

   F. To Improve Morale at Home or Work: Raise Expectations and Tell People Why!

     - *"All People by their Nature Desire to Know"*- Aristotle
     - Commanders Intent: Explain Rationale Actions/Decisions
     - *"Audiences are made, not found"* - Aristotle

   G. How to Get the Most out of This Course?

     - Getting to the Carnegie Hall of Communication- Practice, Practice, Practice!

   H. Why Do "Guardians of the Peace" Fall Prey to "Rope-A-Dope" So Easily?

     - Be Aware of your Personal HOT BUTTONS!
     - The "Role of Hypervigilance in Rope-A-Dope"

COPYRIGHT © 2014 Dolan Consulting Group, L.L.C. All rights reserved. "Surviving Verbal Conflict" is a registered trademark of Harry P. Dolan and cannot be used without the express written permission of Harry P. Dolan    4

I.  Always Ask Yourself the Veteran Communicators Overriding Question

- "Just how important is all this?"

J.  Fundamentals of Verbal Deflection

- *Empathize* - See the world through the eyes of the other

    ✓ Replay – "Let me start over, that didn't come out right"

    ✓ Find common ground- "I see where you're coming from, If you were a police officer what would you do if someone…"

    ✓ Provide people options – And, there is always a better Option- alternatives and consequences

- *Paraphrase*-- I hear what you're saying "However…"

    ✓ "Don't debate when you are trying to de-escalate."

    ✓ "Don't bring negative people home with you for dinner"

II.  **How "Guardians of the Peace" Verbally De-escalate conflict – Winning Community Confidence and Trust**

A.  *Warning Signs* – Notice when verbal conflict is about to change your career and your life and not in a good way (*Why can't people just act more like me?*)

B.  The descendants of Valley Forge want to know WHY

C.  Connect to the wisdom of Aristotle - Introducing Chief Dolan's *Rhetorical Continuum*

D.  "Audiences are made not found" - Aristotle

(Graphic – The Rhetorical Continuum: *How Aristotle would de-escalate people under the influence*)

COPYRIGHT © 2014 Dolan Consulting Group, L.L.C. All rights reserved.  "Surviving Verbal Conflict" is a registered trademark of Harry P. Dolan and cannot be used without the express written permission of Harry P. Dolan

- Ethos
- Logos
- Pathos

E.  Rhetorical Continuum
    *Safety first* – Establish the ground rules

- Situation I - *Meet and Greet*: Ethos– Ethical appeal- Reason for encounter

    ✓ Credo: Yes, your appearance and what you say matters – Your credibility *(80% of people comply with our requests and directives when we act and look the part of the professional)*

    (1) Manage your moment of truth

    (2) From the receiver's point of view:
        93% Delivery Style

    (3) Human Universals

    ✓ Chief Dolan's *Language of The Street Fallacy*

    (1) Beware of uniform courage

    (2) Avoid creating officer jeopardy

    (3) Chief Dan Savages' "GRR Concept"

    (4) Get Ready *"Officer "Schitztorm" is on Scene"*

- Situation II - *Explain*: Logos: Logical appeal - Explain the Why

    ✓ Commanders Intent - Raise organizational morale by telling people WHY and explaining the rationale your decision, practice or policy.

COPYRIGHT © 2014 Dolan Consulting Group, L.L.C.  All rights reserved.  "Surviving Verbal Conflict" is a registered trademark of Harry P. Dolan and cannot be used without the express written permission of Harry P. Dolan

- Situation III - *Options*:  Pathos - Emotional appeal

    ✓ What's in this for me? - Greed motivates

    ✓ Alternatives/Consequences

        *Act / Closure* –To comply or not comply the citizen's decision

    ✓ Resolve the conflict

    ✓ Exhaustion of the Rhetorical Continuum Strategies

    ✓ Confirm decision

    ✓ Take enforcement action

    ✓ tactically disengage

- The *Rhetorical Continuum* in action

    ✓ Examples

        1. Traffic Stops
        2. Calls for service

III.  **The Nuts and Bolts of Surviving Verbal Conflict** – What Works!

A.  How the Veteran Communicator Survives Verbal Conflict – Read and Heed

- *Listen* – Just don't wait to talk; gather intel

    ✓ *Body language* – "Your body language shapes who you are." - Amy Cuddy

    ✓ Watch for verbal and non-verbal pre- attack indicators The body can' lie

        1. Beware your personal danger zone

        2. *Interpersonal Cues Predicting Violence*- Johnson

COPYRIGHT © 2014 Dolan Consulting Group, L.L.C. All rights reserved. "Surviving Verbal Conflict" is a registered trademark of Harry P. Dolan and cannot be used without the express written permission of Harry P. Dolan

✓ Paraphrase – Reflect your understanding

✓ Practice Chief Dolan's *Verbal Contact and Cover*

1. Confront the bystander effect and group think
2. Sergeant Coffee wants to talk you!

IV.   **More Tools for Your Tool Box**

A.   Understand "Police Legitimacy" / Appreciate what the research reveals

B.   *More with Twenty-four* – Employ Chief Dolan's 24 Hour Rule

C.   *TUI* – Talking, texting or Typing under the influence of a substance, anger, rage or grief

D.   Apply the FAA sterile cockpit rule

E.   Manage the *crime scene social*

F.   Dust 'em' off - Sgt. Jim Dolan– Leave people understanding the reason for your actions

G.   Debrief - The importance of debriefings

V.   **You Too Can Survive Verbal Conflict**

A. Take-A-Ways
B. Closing Comments

COPYRIGHT © 2014 Dolan Consulting Group, L.L.C. All rights reserved. "Surviving Verbal Conflict" is a registered trademark of Harry P. Dolan and cannot be used without the express written permission of Harry P. Dolan



PLAINTIFF'S
EXHIBIT
#21
Meyn 6/21/18

EUCLID_DISCOVERY_00907

## CITY OF EUCLID POLICE DEPARTMENT

## PERSONNEL EARLY WARNING SYSTEM

**I. POLICY STATEMENT:** It is the policy of the Euclid Police Department that a comprehensive Personnel Early Warning System is an essential component of good discipline in a well managed law enforcement agency. Pursuant to this policy the establishment of an Early Warning System is necessary for the proactive identification of potential problem employees and/or personnel experiencing stress and related emotional difficulties which can become a side effect common to the profession of law enforcement. The Personnel Early Warning System relies on the continuing vigilance of the supervisory staff to preempt problems with a menu of options and remedial actions to increase agency accountability and offer employees healthy options for personal and professional growth.

**II. PURPOSE:** The purpose of this policy is to provide the supervisory staff of the Euclid Police Department the tools monitor problem employees or employees exhibiting behaviors resulting from stress and /or emotional difficulties both job related and non-job related, and present healthy options to stop or deter the progression of these problems, stressors or difficulties before they result in negative consequences regarding employee performance, the employee or fellow employees, the agency or the general public.

## III. DEFINITIONS:

Actionable Event – a recognizable occurance of demonstrated behavior(s) or patterns of behavior(s) exhibited by an employee that may require preemptive action by supervision in the interest of both the employee and the agency.

Peer Support Personnel – a volunteer member of the Euclid Police Department whose education, training or experience provide an opportunity to counsel and mentor an employee having problems with work performance, emotional difficulties or stress.

Employee Assistance Program – the Lifestyle EAP (LEAP) provides both employees and management with comprehensive counseling and management problem solving tools. Confidential services may be initiated by phone 216-448-8170 or on-line with company I.D. # CE11 and password: lifestyleeap .

Mental Health Professional – a licensed professional, counselor, psychotherapist,psychologist or psychiatrist.

Management referral – a referral to peer support personnel, mental health professional or Lifestyle EAP initiated by a member of the supervisory staff. Compliance with this type of referral may be voluntary or mandatory depending on situationally dependant circumstances.

Personnel Early Warning System (PEWS) – a time sensitive system designed to identify the early indicators of performance, significant emotional events and/or stress related problems requiring command staff to act upon critical information in a positive way, prior to discipline.

EUCLID_DISCOVERY_00907

EUCLID_DISCOVERY_00909

10. Substance Abuse.

B. PEWS Review: The examination of crises in a subordinates personal life is a sensitive issue and any intervention on the part of supervision must arise from an exhibited actionable event effecting workplace performance or safety. However when supervision becomes aware of an actionable event there is a clear duty to act in the best interest of the agency. When an actionable event or pattern of actionable events occur the supervisor should meet with the subordinate to:

1. Determine if the behaviors exhibited may point to the need for counseling. *Agree and document*
2. Gather input from the employee to determine their level of cooperation and agree on the type of assistance such as peer support personnel(who may have endured similar problems), Lifestyle/ EAP referral, or referral to a mental health professional on a voluntary basis. *Signal Management Referral to EAP,*
3. Set expectations and check for understanding of those expectations.
4. Document the process *and expectations* *monitor*
5. Follow up with the officer at regular intervals to measure progress.
6. Submit a confidential written report to the Chief of Police for review.
7. The decision to make a mandatory referral to counseling shall not be made without consulting the Chief of Police. *and HR Manager.*

## VI. SUPERVISORY ACCOUNTABILITY: Supervisors are expected to engage in a course of conduct that supports this policy for the well being of their subordinates and the agency. Compliance with this policy shall constitute a mandatory component of the supervisors performance evaluation. This policy shall not penalize any supervisor for unforseen events that occur with no prior actionable event recognized by supervision nor shall this policy restrict the use of discipline when necessary to correct maladaptive behaviors. However supervisors need to take an active role in developing a preemptive strategy to address actionable events as they arise. Components of a model strategy should include: *identifying and assisting w/*

1. An understanding of the normal characteristics of the police professional.
2. Development of peer support staff that can assist officers with professional development. *w/*
3. Communicate regularly with officers in a positive way. Be approachable.
4. Familiarize yourself with the resources of the City of Euclid Human Resource Department whose staff may provide practical strategies to effectively manage people.
5. Understand the use and importance of the Lifestyle Employee Assistance Program in the health of the agency and the employee. *and formal effort*
6. Recognize that the obvious exhibiting of maladaptive behaviors by subordinates cannot be ignored,delegated or transferred to the responsibility of others. *Referral process*
7. Develop metrics to measure the outcomes of your strategy pertaining to performance problems,job-related problems and non-job related problems or other actionable events.
8. Confidentiality is a necessary component to the success of this policy and the credibility of supervision efforts. Any necessary disclosures should be non-specific and general in nature.

EUCLID_DISCOVERY_00909

# EWS and Accountability

## *EWS improve accountability within the organization by:*

1) providing supervisors with a tool for tracking and monitoring performance;
2) synthesizing important data and information related to individual, unit, and supervisory performance;
3) requiring command staff to act upon critical information in a positive way, prior to discipline

©Karen L. Amendola, Ph.D.          Police Foundation 9

---

EUCLID_DISCOVERY_00911

# Successful Risk Management Requires:

- Interpretation of data and information
- Periodic monitoring of key risk indicators
- Supervisory judgment and authority to intervene
- Alternatives to discipline

©Karen L. Amendola, Ph.D.          Police Foundation 10

---

## THE SYSTEM DOES NOT MAKE DECISIONS –

## *IT IS ONLY A TOOL*

### *SUCCESSFUL* RISK MANAGEMENT *REQUIRES* **YOUR** **KNOWLEDGE, EXPERIENCE, DISCRETION, AND JUDGMENT**

©Karen L. Amendola, Ph.D.          Police Foundation 11

---

# Components of a Risk Management Strategy

- Implement an EWS
- Hold Risk Management Meetings
- Generate Meaningful Reports
- Initiate Proactive Screening, Integrity Testing, and "Fitness for Duty Evaluations"
- Conduct Periodic Departmental Audits
- Implement Routine Community Surveys
- Provide of Alternatives to Discipline (e.g. training, counseling, CISD, EAP, etc.)

©Karen L. Amendola, Ph.D.          Police Foundation 12

EUCLID_DISCOVERY_00911

EUCLID_DISCOVERY_00913

ible ways in which data can be utilized helpfully, and building the program accordingly. That is, we don't know what we don't know. Also, there are numerous applications that may be beneficial, but if data is not entered correctly, resulting conclusions may be skewed because garbage in, garbage out.

Off-the-shelf software programs are usually set up with standard features and reports. Although not all the standard, pre-programmed reports fit an agency's needs, they give the user a starting point — direction and guidance to reporting areas it might not realize existed. Considerable customization is also possible.

Some software packages allow the user to link to master files other files of text, video, audio, Adobe and a variety of digital images. This reduces the need for multiple files and creates more centralized repositories. The programs also have a multi-level access screening built in, allowing the user control of who has access to specific features. Several users can contribute information / documents without the agency losing control of security aspects important to internal affairs and other sensitive personnel information files.

Finally, and in some ways most importantly, the user should not have to be an information technology expert to operate the system successfully. Vendor-provided training and technical assistance should be available and utilized. Pre-purchase research helps ensure existing customers are able to use the program and are satisfied with its dynamics and benefits.

## Conclusion

An agency can have the best software program money can buy, but if it doesn't have clear and enforced policy mandating documentation, routing and entry requirements, the system will be substantially devalued. Such policy must focus on supervisory accountability and require that even minor misconduct and negative behavior be entered for tracking purposes. Supervisory consistency is the key to fairness and

proper function. If relevant behavior or performance is not brought into the database, documented and tracked, the program will not serve its purpose.

Some will argue tracking negative behavior or performance-related issues is wrong and actually does disservice to employees. In fact, used improperly, such systems can be counter-purposeful and even damaging to the organization and its members. The second half of this article will identify early warning criteria and related systems with emphasis on how to use such data and associated interventions properly, without inappropriate negative effect on employees or the organization — and for extremely positive value.

Many law enforcement officers with stellar careers have reached that level of excellence because of feedback they have received from mentors and others, often resulting from review of not-always-positive performance or behavior-

related issues that taught them how to succeed. Mistakes and other troubling circumstances, when identified and reviewed purposefully, can be valuable. Many people would not be where they are today had not someone pointed out to them where they could improve and how to avoid potential pitfalls.

Risk management is a high priority throughout law enforcement. An identification and intervention program is an essential part of managing risk and, used right, can help employees to avoid problems, improve themselves, and better succeed. Not only can it make an organization smarter by increasing its self-awareness and accountability, it can offer employees a better chance to work harmoniously with their organization, in line with its mission, values and vision.

**LaO** Post your comments on this story by visiting www.lawandordermag.com



Click on Elfrto at - www.lawandordermag.com reader service #10

EUCLID_DISCOVERY_00915

tistical correlation between activity and negativity. The more police work one does, the more there is to go wrong. Obviously, the more arrests one makes, the more times one will need to use force. Similarly, the more traffic stops one makes, the more likely one is to be the subject of a complaint. Working well and smart can mitigate these likelihoods but it can't eliminate them.

But what's the harm in using such raw number (like "10") thresholds – other than they are not very "smart?" Consider the potential effects on Officer A's future performance when he/she realizes that "10" is the alarm threshold for placement on the possible problem child list – assuming that Officer A doesn't want to be on that list.

The first possibility is that Officer A will deactivate to some extent, at least in terms of making arrests. Doing so will have the natural effect of reducing numbers of reportable force and will at some point get him off the list. Of course, this is not a desirable outcome, unless there is some problem with the type of arrests being made.

Another possibility is that Officer A is unwilling to deactivate but very much wants to get off the possible "force monster" list. An option is to stop reporting reportable force, at least when he knows he is getting close to the threshold of 10. Naturally, when he eventually gets caught not reporting reportable force, he'll be in trouble administratively for his policy violation – an undesirable outcome all around.

A third and most troubling possibility is that, in order to stay off the list, Officer A will become hesitant or reluctant, particularly when he/she nears the threshold, o use force that most definitely should have been used. This, of course, can get the officer hurt or killed.

It can also result in the officer having to use more force ultimately in the incident because the hesitance or reluctance causes loss of tactical advantage, and a consequent need to make up for that loss. These are dangerous and potentially disastrous outcomes – most unwanted.

Of course, in countless other areas of performance and behavior, the same types of problems would exist, just without such high stakes potentials. The law enforcement activity most likely to generate a rudeness complaint is issuing a traffic citation. An officer who wants to reduce rudeness complaints will quickly realize that reduction of traffic stops and tickets is the easy fix.

## Most Agencies' "Solution" Is Not A Solution

Many agencies have considered the problems described in the preceding section. Most have concluded the way to keep things simple and easy (like "10"), and to avoid the obvious associated problems, is to use the raw-number threshold to identify the target officer then to analyze activity and other relevant data to determine whether what "seemed" to be a potential problem is "really" a potential problem. There are two problems with this approach.

The first problem is that many of the wrong officers

will be identified. Highly active officers will hit the list way too often and low activity officers may stay off the list entirely (unless low activity thresholds are made a separate trigger criterion). The system might never identify the right subjects of concern.

The second problem is that necessary inquiry by the early-warning system operative may include approaching the officer or officer's supervisor as an aid to figuring out whether or not the organization should be "alarmed" or whether it is just the officer's activity level causing the "alarming" numbers. This approach will typically alert the officer to the fact that he/she is triggering alarms and can result in all the negative outcomes described in the preceding sections.

The level of stealth and care necessary to reach the needed data without alerting the officer to the inquiry is unlikely to be used. Even if it is only the officer's supervisor who is approached, many supervisors will not resist the urge to tell the subject officer that "IA came calling" but that the supervisor "took care of it" in favor of the officer.

LaO  Post your comments on this story by visiting www.lawandordermag.com



MAKE AN **INFORMED DECISION** ABOUT YOUR FLEET

MORE THAN **50** FLEET SPECIFIC VENDORS

Full Conference Registration only **$129!**
Expo Only Pass is FREE!

POLICE FLEET EXPO
**PFE
SOUTHWEST**

MAY 22-24, 2013
FT. WORTH CONVENTION CTR.
FT. WORTH, TX

**SHOW FLOOR OPEN ▶ MAY 23-24**

For information on Attending, please contact:
Lisa McDade | 800-843-9764 Ext 31; lmcdade@hendonpub.com

For information on Exhibiting, please contact:
Pete Kingwill | 800-843-9764 Ext 23; pete@hendonpub.com

WWW.POLICEFLEETEXPO.COM

EUCLID_DISCOVERY_00915

and should be used. Raw number thresholds could be extremely misleading. So, driving complaints could be tracked as a percentage of other officers' driving complaints. Why does Officer A get complained on regarding driving 32 percent more often than any other officer? Using GPS technology, an agency could learn every time an officer drives more than 85 mph. If that officer wasn't on a freeway or in close pursuit of a violent felon, 85 mph is dangerously fast and a matter of early warning concern.

Vehicular accidents and pursuits as a percentage of other officers' numbers could be tracked using the same analysis as that above. The same type of data could be used to identify broader organizational issues. In all of this work, the risks targeted would be injury and death, especially of innocent people, and also property damage. If an agency didn't employ needed GPS technology, it could still evaluate "too good" response times and available pursuit data, including that flowing from in-car cameras.

## Case Performance

Even though most agencies use their systems primarily to track and identify behavior of those working the patrol function, they could and should be used more broadly. In respect to case performance, the agency could assess cases rejected for prosecution as a percentage of other officers' numbers.

Everybody has cases rejected, but why are Officer A's cases rejected 26 percent more frequently than any other officers'? Why do prosecutors hate Officer A's cases so much worse than they hate other officers' cases? Although this data area might also be driven mostly by patrol activity, it could involve other officers, detectives and even crime scene personnel. Using the same analysis just mentioned, the agency could track cases dismissed by judges as a percentage of other officers' numbers in that regard.

Evidence suppressions could and should also be looked at as a percentage of other officers' numbers using the same analysis. Also, if a suppression order includes an evidence-based judicial finding that an officer has violated someone's constitutional rights, an internal investigation should be launched.

It is understood that judges make mistakes in such matters, but other complaints are routinely investigated without first knowing their legitimacy. Certainly judicial allegations should receive the same favor. In any event, it is dangerous in terms of downstream civil liability exposure that judges would make such "accusations" publicly and officially and that law enforcement would just ignore them.

It is sadly true that many officers are unaware of evidence suppressions in their cases or the reasons for case dismissals. Some officers don't even know their cases have been dismissed. Officers should keep up with what's happening to their cases and be required to report evidence suppressions as they do uses of force. Court systems aren't always helpful in this regard, but obviously case outcomes should be tracked. The risks targeted in the case performance area are constitutional rights violations, poor report writing, and weak courtroom testimony skills.

## POSSIBLE TOP 20 LIST

1. Informant problems, including inappropriate fraternization and relationship
2. Association with criminals
3. Loss of equipment
4. Attendance problems
5. Sick leave use and abuse
6. Lack of rest indicators
7. Changes in work habits
8. Deterioration in physical fitness level
9. Changes in appearance
10. Attitude changes
11. Lack of "outside" involvements
12. Frequent address changes
13. Calls for service to officer's residence
14. Lifestyle and financial changes (up or down)
15. Alcohol or prescription drug abuse
16. Stressors like divorces, deaths in family, children in school problems, etc.
17. Performance in situational/contextual training
18. Feedback from trainers
19. Results of post-incident reviews, including use-of-force reports
20. Citizen input, like street names (consider "Thumper")

## Personal Matters

In addition to all these ratio and percentage-based triggers, there are a multitude of other issues, somewhat more "personal" in nature, which need consideration, and which will require thoughtful methods of discovery and intervention. This will help agencies identify inappropriate relationships, stress, lack of rest, substance abuse, lack of critical knowledge and/or skills, propensity to use force and excessive force, temptations, desperation, and potential corruption.

Risk management is a high priority throughout law enforcement and is the job of every supervisor at every level, from sergeant to chief or sheriff. An identification and intervention program is an essential part of managing risk and improving accountability to standards. Used right, an early warning system can help employees identify and solve problems, improve themselves and their circumstances, and better succeed. It can make an organization smarter by improving its self-awareness and vision.

But if alarm thresholds and triggers are chosen poorly and intervention methods are selected unwisely, early warning systems can backfire and produce dangerously counter-purposeful consequences. Einstein contended that "the true sign of intelligence is not knowledge but imagination." Most early warning systems are not very imaginative. They tend to identify the wrong officers, reduce positive activity, and make officers less safe. Logic and caring demand better.

 Post your comments on this story by visiting www.lawandordermag.com

EUCLID_DISCOVERY_00919


## Research in Brief

### Issues and Findings
...continued

system in 1999; another 12 percent were planning to establish such a program.

Larger agencies were more likely than smaller agencies to use an early warning system. Among agencies with 1,000 or more sworn officers, 79 percent had or planned to have an early warning system; only 56 percent of agencies with between 500 and 999 sworn officers had or planned to have such a program.

No standards have been established for identifying which officers should participate in early warning programs, but there is general agreement that a number of factors can help identify problem officers: citizen complaints, firearm-discharge reports, use-of-force reports, civil litigation, resisting-arrest incidents, and pursuits and vehicular accidents.

Data from the three case-study agencies (in Miami, Minneapolis, and New Orleans) indicate the following:

● In spite of considerable differences among the programs, each program appeared to reduce problem behaviors significantly.

● Early warning systems encourage changes in the behavior of supervisors, as well as of the identified officers.

● Early warning systems are high-maintenance programs that require ongoing administrative attention.

A caveat is in order about the findings reported here. The research design was limited in a number of ways, and each of the early warning systems studied operates in the context of a department's larger commitment to increased accountability. It is impossible to disentangle the effect of the department's culture of accountability from that of the early warning program.

***Target audience:*** State and local law enforcement administrators, planners, and policymakers; researchers; and educators.

more.[5] Usable responses were received from 571 agencies, a response rate of 69 percent. The response rate was significantly higher for municipal agencies than for sheriff's departments.

Approximately one-fourth (27 percent) of the surveyed agencies had an early warning system in 1999. One-half of these systems had been created since 1994, and slightly more than one-third had been created since 1996. These data, combined with the number of agencies indicating that a system was being planned (another 12 percent), suggest that such systems will spread rapidly in the next few years.

Early warning systems are more prevalent among municipal law enforcement agencies than among county sheriffs' departments.

### How does an early warning system work?

Early warning systems have three basic phases: selection, intervention, and postintervention monitoring.

**Selecting officers for the program.** No standards have been established for identifying officers for early warning programs, but there is general agreement about the criteria that should influence their selection. Performance indicators that can help identify officers with problematic behavior include citizen complaints, firearm-discharge and use-of-force reports, civil litigation, resisting-arrest incidents, and high-speed pursuits and vehicular damage.[6]

Although a few departments rely only on citizen complaints to select officers for intervention, most use a combination of performance indicators. Among systems that factor in citizen complaints, most (67 percent) require three complaints in a given timeframe (76 percent specify a 12-month period) to identify an officer.

**Intervening with the officer.** The primary goal of early warning systems is to change the behavior of individual officers who have been identified as having problematic performance records. The basic intervention strategy involves a combination of deterrence and education. The theory of simple deterrence assumes that officers who are subject to intervention will change their behavior in response to a perceived threat of punishment.[7] General deterrence assumes that officers not subject to the system will also change their behavior to avoid potential punishment. Early warning systems also operate on the assumption that training, as part of the intervention, can help officers improve their performance.

In most systems (62 percent), the initial intervention generally consists of a review by the officer's immediate supervisor. Almost half of the responding agencies (45 percent) involve other command officers in counseling the officer. Also, these systems frequently include a training class for groups of officers identified by the system (45 percent of survey respondents).

**Monitoring the officer's subsequent performance.** Nearly all (90 percent) the agencies that have an early warning system in place report that they monitor an officer's performance after the initial intervention. Such monitoring is generally informal and conducted by the officer's immediate supervisor, but some departments have developed a formal process of observation, evaluation, and reporting. Almost half of the agencies (47 percent) monitor the officer's performance for 36 months after the initial intervention. Half of the agencies indicate that the followup period is not specified and that officers are monitored either continuously or on a case-by-case basis.

EUCLID_DISCOVERY_00919

EUCLID_DISCOVERY_00921

## Research in Brief

engaged in those components they perceived to be related to the practical problems of police work, particularly incidents that often generate complaints or other problems. Officers were disengaged, however, in components that they perceived to be abstract, moralistic, or otherwise unrelated to practical aspects of police work.

This study could not determine the most effective aspects of intervention (e.g., counseling regarding personal issues, training in specific law enforcement techniques, stern warning about possible discipline in the future) or whether certain aspects are more effective for certain types of officers.

**The impact of early warning systems on supervisors.** The original design of this study did not include evaluating the impact of these systems on supervisors. Nonetheless, the qualitative component of the research found that these systems have potentially significant effects on supervisors. The existence of an intervention system communicates to supervisors their responsibility to monitor officers who have been identified by the program. The New Orleans program requires supervisors to monitor identified officers under their command for 6 months and to complete signed evaluations of the officers' performance every 2 weeks. Officials in Miami–Dade think that their system helps ensure

## Three cities, three stories

The three early warning systems in the sites selected for the case studies have different administrative histories and program structures, and the three police departments have different histories with regard to police officer use of force and accountability.

**Miami–Dade County.** The Miami–Dade Police Department (MDPD) currently enjoys a reputation for high standards of professionalism and accountability to reforms instituted following controversial racial incidents in the late 1970s and early 1980s.

As a result of the real and perceived problems between police and citizens, the Dade County Commission enacted legislation that opened to the public the internal investigations conducted by MDPD. In addition, an employee profile system (EPS) was created to track all complaints, use-of-force incidents, commendations, disciplinary actions, and dispositions of all internal investigations. As an offshoot of the EPS, MDPD created the Early Identification System (EIS) under the supervision of the Internal Review Bureau.

MDPD's EIS began operating in 1981. Quarterly reports list all officers who receive two or more citizen complaints that were investigated and closed or who were involved in three or more use-of-force incidents during the previous 3 months. Annual reports list officers who were identified in two or more quarterly reports. Monthly reports list employees who received two or more complaints during the previous 60 days, regardless of disposition.

The reports are disseminated through the chain of command to the supervisors of each officer identified. As one official described the reports "as a resource to determine if job stress or performance problems exist." The information is intended to help supervisors evaluate and guide an employee's job performance and conduct in conjunction with other information.

The intervention phase of EIS consists primarily of an informal counseling session between the supervisor and the officer. The supervisor is expected to discuss the report with the officer and determine whether further action is needed. Such actions may include making referrals to employee assistance programs inside or outside the department, such as psychological services, stress abatement programs, or specialized training programs.

Postintervention monitoring of officers in the early warning system is informal and conducted by supervisors. Review of officers' performance records is designed to identify officers who continue to exhibit patterns of misconduct and to make the officers aware that their performance is being closely scrutinized. Additionally, the program puts supervisors on notice that their responsibilities include the close monitoring of those whose performance is problematic.

**Minneapolis.** When the study began, the Minneapolis Police Department (MPD) had a mixed reputation and was in transition under the leadership of a relatively new chief. MPD has long had a national reputation as a police department receptive to research. At the same time, however, MPD had a troubled local reputation with respect to the use of force by its officers. This reputation eventually brought a number of important political and administrative changes in the 1990s. The mayor declined to reappoint the incumbent police chief, who had failed to discipline the police officers. The new police chief began raising standards of accountability, among other reforms, he instituted a version of the COMPSTAT process. These changes have had direct implications for the system of accountability within the MPD and complicate any attempt to evaluate the impact of MPD's early warning system.

The program was established in the early 1990s and has undergone a number of significant administrative changes, including a period of slightly more than 1 year in the mid-1990s when the system ceased functioning altogether. After the data collection period for this study, a new procedure was instituted that calls for reviewing all reports of potentially problematic officer performance every

EUCLID_DISCOVERY_00921

EUCLID_DISCOVERY_00923

## Research in Brief

and developing carefully tailored responses.[12] Early warning systems approach the problem officer as the concern to be addressed, and the intervention is the response tailored to change the behavior that leads to indicators of unsatisfactory performance.

**Early warning systems and traffic-stop data.** The issue of racial profiling by police has recently emerged as a national controversy. In response to this controversy, a number of law enforcement agencies have begun to collect data on the race and ethnicity of drivers stopped by their officers.

An officer who makes a disproportionate number of traffic stops of racial or ethnic minorities (relative to other officers with the same assignment) may be a problem officer who warrants the attention of the department. Traffic-stop information can be readily incorporated into the database and used to identify possible racial disparities (as well as other potential problems, such as disproportionate stops of female drivers or unacceptably low levels of activity).

**Legal considerations of these systems.** Some law enforcement agencies may resist creating an early warning system for fear that a plaintiff's attorney may subpoena the database's information on officer misconduct and use that information against the agency in lawsuits alleging excessive use of force.[13] Several experts argue, however, that in the current legal environment, an early warning system is more likely to shield an agency against liability for deliberate indifference regarding police use of force. Such a system demonstrates that the agency has a clear policy regarding misconduct, has made a good faith effort to identify employees whose perform-

ance is unsatisfactory, and has a program in place to correct that behavior.[14]

### Policy concerns and areas for further research

Each of an early warning system's three phases involves a number of complex policy issues.

**Selection.** Although the selection criteria for most early warning systems consider a range of performance indicators, some rely solely on citizen complaints. A number of problems related to official data on citizen complaints, including underreporting, have been documented.[15] Using a broader range of indicators is more likely to identify officers whose behavior requires departmental intervention.

**Intervention.** In most early warning systems, intervention consists of an informal counseling session between the officer and his or her immediate supervisor. Some systems require no documentation of the content of that session, which raises concerns about whether supervisors deliver the intended content of the intervention. It is possible that a supervisor may minimize the importance of the intervention by telling an officer "not to worry about it," thus reinforcing the officer's behavior. Involving higher ranking command officers is likely to ensure that the intervention serves the intended goals. Further research is needed on the most effective forms of intervention and whether it is possible to tailor certain forms of intervention to particular categories of officers.

**Postintervention monitoring.** The nature of postintervention monitoring

varies among systems. Some systems rely on informal monitoring of the subject officers; others employ a formal mechanism of observation and documentation by supervisors. The relative impact of different postintervention monitoring systems on individual officers, supervisors, and departments requires further research.

### One tool among many

Early warning systems have emerged as a popular remedy for police misconduct. This study suggests that these systems can reduce citizen complaints and other problematic police behavior. Officers in the three departments investigated as case studies were involved in substantially fewer citizen complaints and use-of-force incidents after the intervention than before. In these three departments, however, the systems were part of larger efforts to raise standards of accountability. The effectiveness of such a system is reinforced by (and probably dependent on) other policies and procedures that enforce standards of discipline and create a climate of accountability.

An effective early warning system is a complex, high-maintenance operation that requires a significant investment of administrative resources. Some systems appear to be essentially symbolic gestures with little substantive content, and it is unlikely that an intervention program can be effective in a law enforcement agency that has no serious commitment to accountability. It can be an effective management tool, but it should be seen as only one of many tools needed to raise standards of performance and improve the quality of police services.

EUCLID_DISCOVERY_00923

EUCLID_DISCOVERY_00925

PER-05.1



# PERSONNEL EARLY WARNING SYSTEM

| | |
|---|---|
| *Date of Issue*<br>**February 6, 2004** | *General Order Number*<br>**04-01** |
| *Effective Date*<br>**February 22, 2007** | *Section Code*<br>**PER-05** |
| *Reevaluation Date*<br>**February 2010** | *Amends / Cancels* |
| *C.A.L.E.A.*<br>**22.2.3, 35.1.9** | *Reference*<br>**Personnel Early Warning System** |

## INDEX AS:

Disciplinary System
Personnel Early Warning System

Employee Assistance Program
Supervisor Responsibilities

## I.    PURPOSE

The purpose of this order is to outline identify the procedures to be used to identify potential personnel problems in their initial stages in order to redirect an employee's actions / behavior in a fashion consistent with departmental values and standards.

## II.    POLICY

It is the policy of the Iowa City Police Department to maintain a Personnel Early Warning System to provide systematic reviews of specific, significant events involving agency employees. This system is necessary for the Department to exercise its responsibility to evaluate, identify, and assist employees who exhibit signs of performance and/or stress related problems. The Personnel Early Warning System is one method by which employees may be identified as possibly needing assistance with performance and/or stress related problems. The system is intended to serve as a systematic approach to highlight tendencies that may otherwise be overlooked.

EUCLID_DISCOVERY_00927

PER-05.3

7. Motor vehicle pursuits;
8. Supervisory and employee reports;
9. Sick usage/officer injury (temp disability)
10. Tardiness;
11. Absenteeism
12. Interference / Obstruction charges;
13. Assault on officer;
14. Officer injury report;
15. Vehicle accidents;
16. Civil litigation

C. If the Watch Commander or Section Supervisor reasonably believes, after a review of the collected materials, that further review is necessary, the supervisor shall inform the employee's division commander of the findings. The division commander shall examine the findings and if in agreement, the division commander shall assign a supervisor to further review the incidents.

D. Once assigned by the division commander, the reviewing supervisor shall schedule a counseling meeting with the employee. The supervisor shall prepare a written summary of the meeting, indicating if further inquiry is warranted and any corrective actions deemed necessary, consistent with General Order 89-02 Disciplinary Philosophy.
   a. This may be in form of positive discipline such as training or counseling and/or punitive in nature ranging from a verbal reprimand up to and including termination.
The summary shall be forwarded to the Chief of Police through the chain of command. The subject employee shall also be provided a copy of the summary of the review.

E. Supervisors conducting a review shall have access to department reports, reviews, summaries, and analysis that may aid them in completion of the PEWS review.

F. If deemed necessary by the Chief of Police or division commander, a meeting shall be scheduled with the Chief of Police and the employee's division commander to discuss the findings of the review and the recommended course of corrective action.
   a. This action may be voluntary, for example the employee seeking assistance through the Employee Assistance Program, or department mandated in accordance with the provisions set forth in General Order 89-02 "Disciplinary Philosophy".

G. All reviews shall be maintained in the strictest confidence and shall not be discussed with other employees unless it is necessary for completion of the review. All employees made aware of a review shall be informed that unauthorized disclosure of any aspect of the review may result in disciplinary action.

PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
# 22

# EUCLID POLICE DEPARTMENT

HAND - OUT
(PANAGIOTOU)

## 2017
## DEFENSIVE TACTICS TRAINING

*protecting and serving*
*the POOP out of you*





# EPD MISSION STATEMENT

The Euclid Police Department is committed to creating a safe, secure community by enforcing the laws of the City of Euclid and the State of Ohio. We shall work independently and in concert with other public and private resources, and with our residents to maintain in our city the highest quality of life and the most desirable environment in which to live, work, or visit.



# MISSION STATEMENT (ReVisited)

- The Euclid Police Department is committed to creating a safe, secure community by enforcing the laws of the City of Euclid and the State of Ohio.

- We shall work independently and in concert with other public and private resources

- *and with our residents* (This means working WITH our residents to improve the community)

- to maintain in our city the *highest quality of life and the most desirable environment in which to live, work, or visit.*



# ROLE OF THE OFFICER

## TO PROTECT & SERVE

- The Officer's primary function is to <u>protect</u> and <u>serve</u>.

  *To Serve — To provide duties and services for another*

  *To Protect - to shield from attack, invasion, loss, annoyance*

- ## First Responder (Call Response / Emergencies)

  The Officer's role is to arrive on scene and calmly de-escalate the situation. This includes all types of situations to include family troubles, domestic disputes, & mental/suicidal persons

- ## Proactive Law Enforcement

  Proactivity includes active patrols in your area of responsibility, business checks/special attentions, and interactions with the public through businesses, walk and talks or traffic stops



# ROLE OF THE OFFICER

## Decision Making

- Proactive actions by Police Officers should positively impact the lives of the citizens of the city.

- Keep your eyes on the BIG Picture, not just what is immediately in front of you.

- Prioritize your actions and ensure that those actions will achieve the desired result.

- Be aware that your actions in any situation also send a message to the public and to the citizens you are serving. Ensure the message you are sending is the right message!



# ROLE OF THE OFFICER

## Expectations / Guidance on Officer Conduct

Every call should be handled with the intent to PROTECT the innocent and SERVE those in need.

Note: Frustration with participants or your perceived "stupidity" of a call should not impact the conduct of our Officers!









# ROLE OF THE OFFICER

Yes, Law Enforcement does enforce traffic laws and write tickets...



# ROLE OF THE OFFICER

But, they also do this...











# ROLE OF THE OFFICER

AND this...



# ROLE OF THE OFFICER

## Expectations / Guidance on Officer Conduct

REMINDER: As Police Officers, we will see all different types of people. Many of those are great people who just happen to be at a really low point in their life.

It is NOT the Officer's job to judge the lifestyle or the decisions. Police are there to help people through their tough time, to defuse the situation, and to enforce the law when necessary.

Every one comes from a different back ground, a different up bringing, and have had different life experiences. Each person's actions and perspectives are influenced by those things.



# ROLE OF THE OFFICER

## Decision Making

When conducting traffic stops or pursuits or responding to emergency calls, fights, domestics, disorderly conducts, shootings, bar issues, etc... Please make a good decision.

- Are your Officers currently at risk and requiring your fast response?

  - Are you making good decisions that keep your partners safe?

    - What tools are available for you?

GOOD COMMUNICATION? MANPOWER? WILL YOU ARRIVE TOGETHER? SHOULD YOU SET A PERIMETER? DO YOU HAVE SURVEILLANCE?

Use common sense, take a deep breath, and keep things in perspective. Your poor choice could cost your partner his life. Odds are, you'll have many more chances to arrest them again.



# ROLE OF THE OFFICER

## Proactivity and Decision Making

- Be aware that the decisions you make and the situations you create will impact more than just your life and the lives of those you are serving. Your fellow Officers and their families are impacted by your choices as well!

Note: *Euclid Police Use of Force Policy* —

*"The apprehension of criminal offenders must at all times be SUBSERVIENT to the protection of human life including his/her own."*

https://www.youtube.com/watch?v=DwvbVkld0d0



# ROLE OF THE OFFICER

## *EPD Policy – Respect for Constitutional Rights*

- No person has a constitutional right to violate the law; neither may any person be deprived of his constitutional rights merely because he or she is suspected of having committed a crime

- YOU are responsible to know the law along with policies / procedures regarding arrest, search & seizure, etc.

**Note: The idea of "Even if it gets thrown out, its still off the street" or "I can get away with this" does NOT protect the city, the department OR the Officer(s) from civil liability.**



# ROLE OF THE OFFICER

## THE 4TH AMENDMENT TO THE U.S. CONSTITUTION

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.



# ROLE OF THE OFFICER

Probably Cause –

Reasonable Suspicion –

Terry Pat Down –

Search –

Seizure -



# ROLE OF THE OFFICER

## *EPD Policy - Officer Conduct*

- A police officer is the most conspicuous representative of local government and to the majority of the people, the officer is a symbol of stability and authority upon whom they can rely. The officer's conduct on and/or off-duty reflects directly upon the department. Thus, an officer must, at all times, conduct him/her self in a manner which does not bring discredit to him/her self, the Euclid Police Department, or the City of Euclid.

YOU ARE THE ONLY REPRESENTATIVE OUR DEPARTMENT HAS AT YOUR CALLS. PLEASE HANDLE THIS RESPONSIBILITY WITH CARE.



# EPD USE OF FORCE POLICY



FORCE: any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing

Use of Reasonable Force – only what is necessary to "achieve lawful objectives"

Officers shall base their actions and the degree of force upon the degree of resistance.

https://www.youtube.com/watch?v=uj0mtxXEGE8



# EPD USE OF FORCE POLICY

## CONTACT AND COVER PRINCIPLE

- **Contact Officer** builds rapport with person contacted. **Cover Officer** stands in support and provides assistance when needed

- Cover Officer observes scene. Gives feedback as needed. When engaging two parties, Officers should see one another.





# EPD USE OF FORCE POLICY

Your very presence is a level of Force — especially when you are in another person's home!

- The initial demeanor and communication by the Officer(s) can have a huge impact on the outcome of most situations.

- Before giving verbal commands, use verbiage that is not offensive or threatening in an effort to gain willing participation from those parties involved.

- One valuable technique used by Police is "Verbal Judo"





# What is Verbal Judo

- A ____, designed to soften an adversary's resistance to your ____
- A learned skill-not naturally created-
- Verbal Judo ____ and ____ the energy of an opponent in order to ____ of a situation
- The ultimate purpose is to keep ____, and the needs of your community met. If you are not safe, and the community feels un-served, everything else is irrelevant.

# 5 Universal Truths

According to Dr. George Thompson of the Verbal Judo Institute, instead of focusing on how people are different, we should focus on how people are the same.

1. All people want to be treated with dignity and respect.
2. All people want to be asked rather than being told to do something.
3. All people want to be told why they are being asked to do something.
4. All people want to be to be given options rather than threats.
5. All people want a second chance.



©Verbal Defense & Influence with the Verbal Judo Institute, inc





## Verbal Judo

### "Hey, calm down!"

- To the person, it is a criticism of their behavior.

- Suggests they have no legitimate right to be upset.

- Not only is there the problem they were upset about—now they need to defend their reaction to you.

# Verbal Judo vs. Verbal Karate

## Verbal Karate

- Unprofessional
- Express Personal Feelings
- Self-Referential Language – "I - me"
- Not in Contact
- Off-target Reactions

## Verbal Judo

- Professional
- Use of Words to Achieve Professional Objectives
- In Contact with Audience
- Skillful Communication That is On-Target.

©Verbal Defense & Influence with the Verbal Judo Institute, Inc



82

# EPD USE OF FORCE POLICY

## BE AWARE OF COMMUNICATION BARRIERS

- Drug Influence
- Alcohol Influence
- Education or intelligence level
- Emotional Situation
- Bias / Prejudice / Pre-conceived notions
- Previous Negative Experiences with Law Enforcement
- Medical or Mental issues



# EPD USE OF FORCE POLICY



- Confrontation is dynamic (constantly changing)

- Officers must have the ability to be flexible. To escalate and de-escalate and re-escalate as each situation dictates.



# ACTION-RESPONSE CONTINUUM



## INDIVIDUAL'S ACTIONS

Not Responding to Commands
Verbal or Physical Danger Cues

Refusing to Move - Dead Weight
Pulling Away From Officer

Pushing Officer
Wrestling With Officer

Striking or Kicking Officer

Life Threatening Weaponless Assaults
Attempting to Disarm Officer
Weapons Used Against Officer

## OFFICER'S RESPONSES

Officer Presence
Verbal or Physical Commands
Escort Position
Balance Displacement
Assistance From Other Officers

Take Downs, Joint Manipulations
or Pressure Points
Striking Muscle Groups

Aerosols or Electrical Devices
Baton Restraints
Striking, Punching, Kicking

Baton Techniques or
Sleeper Holds

Deadly Force

© Copyright 1991 Samuel Faulkner



# EPD USE OF FORCE POLICY

- The "Action/Response Continuum" provides options for Officers to move up or down as needed

- The least amount of force used to handle any situation minimizes chance for injury to Officers and other parties and also limits liability

NOTE: Officer Safety is ALWAYS the first priority when responding to calls. You are of no use to anyone including the public you serve if you go down!



# EPD USE OF FORCE POLICY

## READING THE SITUATION

- On arrival, Officers must rapidly be able to assess the situation, plan their approach, and any potential rapid escalations of force that may be needed

*Confirmed Level of Resistance:* The tangible amount of resistance given by a subject against an Officer.

- Once a "Confirmed Level of Resistance" is received from someone, Officers are able to move up and down the Continuum to the appropriate leveled response and should have articulable facts as to why



# EPD USE OF FORCE POLICY

Once any situation has moved beyond the Officers' ability to manage it verbally alone, they must select the appropriate response for affect.

Most often, the goal is to gain control of the suspect(s) as quickly and safely as possible and remove them from the situation.

There is a fine line between tools like joint manipulation, strikes, pepper spray, and tasers.

Ensure you can clearly articulate what you did and why you did it.



# EPD USE OF FORCE POLICY

DEADLY FORCE: any force that carries a substantial risk that it will proximately cause or result in death

- Nothing shall be construed to limit an officer's force options when confronted by a Lethal Threat.

- ANY OPTIONS available shall be considered reasonable when faced with a lethal threat to ensure their survival.

- Officers MUST maintain a SURVIVAL MINDSET!

**Never allow yourself to believe**

**that you will not survive!**

https://www.youtube.com/watch?v=Cc0_ttM8bak&list=PL balcQd0P12NN0sIPy3hTTM0mxdFg3_-3



# EPD USE OF FORCE POLICY

## In Closing - THINGS TO REMEMBER

- Protect and Serve

- Make good decisions

- Keep priorities in order

- Actions should be within spectrum of ability

- Make good notes and document actions in detail

- At the end of the day, make sure you and your partners go home healthy and safely!



EUCLID_DISCOVERY_001232



PLAINTIFF'S
EXHIBIT
#23
PENGAD 800-631-6989

# EUCLID POLICE DEPARTMENT

## 2018 SPRING

## DEFENSIVE TACTICS TRAINING



EUCLID_DISCOVERY_001232

# USE OF FORCE CASE LAW

*Most Common Rights Violations*
*in Use of Force Complaints*

## THE FOURTH AMENDMENT

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.



EUCLID_DISCOVERY_001233

# USE OF FORCE CASE LAW

*Most Common Rights Violations
in Use of Force Complaints*

## THE EIGHTH AMENDMENT

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.



EUCLID_DISCOVERY_001234

# USE OF FORCE CASE LAW

*Most Common Rights Violations*
*in Use of Force Complaints*

## THE FOURTEENTH AMENDMENT

All persons born or naturalized in the U. S. and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.



EUCLID_DISCOVERY_001235

# USE OF FORCE CASE LAW

1. *Graham v. Connor* — The Use of Force standard

2. *Brown v. United States* — The original (1921) *Graham v. Connor* style decision.

3. *Johnson vs Glick* — Excessive force case (The Glick Test)

4. *Wardlaw v. Pickett* — Punching an approaching verbally argumentative person.

5. *Pena v. Leombruni* — Addresses suspect's known mental state regarding force.

6. *Plakas v. Drinski* — No constitutional duty to use lesser force when deadly force is authorized.

7. *Thompson v. Hubbard* — Case where suspect appeared to be drawing a gun and no gun found.

8. *Elliot v. Leavitt* — 20/20 hindsight on officer shooting.

9. *Forrett v. Richardson* — Unarmed fleeing felon applied through Tennessee v. Garner.

10. *Tennessee v. Garner* — Deadly force to prevent escape.



EUCLID DISCOVERY_001236

EUCLID DISCOVERY_001236

# USE OF FORCE CASE LAW

## *Graham v. Connor*

- Graham (A diabetic) has a friend, Berry, drive him to a store to purchase orange juice to counteract the onset of an insulin reaction

- Graham sees a long line inside once he enters the store so he hurries back outside & asks Berry to drive him to a friend's house instead.

- Officer Connor, a city Police Officer, observes Graham enter the store and leave very quickly and becomes suspicious of his activities.

- Officer Connor makes an investigatory traffic stop on the car to see what is going on.

- Additional Officers arrive on scene. A struggle ensues while trying to detain Graham and he sustains multiple injuries during the process.

- Graham is released once Officer Connor determines nothing happened of any criminal nature at the store.



EUCLID_DISCOVERY_001237

# USE OF FORCE CASE LAW

*Graham v. Connor*

- Graham claimed that the Officers used excessive force and violated rights secured to him under the FOURTH AMENDMENT.

## "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated"

THE OBJECTIVE REASONABLENESS STANDARD:

Actions judged in light of facts and circumstances confronting them... through the eyes of a reasonable officer on the scene, rather than with 20/20 vision of hindsight... Not every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers, violates the 4th Amendment...



# USE OF FORCE CASE LAW

## Graham v. Connor

- Graham claimed that the Officers used excessive force and violated rights secured to him under the Fourteenth Amendment.

"*nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.*"

- The District Court granted respondents' motion for a directed verdict at the close of Graham's evidence, applying a four-factor test for determining when excessive use of force gives rise to a § 1983 cause of action, which inquires, *inter alia*, whether the force was applied in a good faith effort to maintain and restore discipline OR maliciously and sadistically for the very purpose of causing harm.



EUCLID_DISCOVERY_0012239

# USE OF FORCE CASE LAW

*Graham v. Connor*

## RELEVANT FACTORS CONSIDERED:

1. The severity of the crime suspected

2. Whether the suspect poses an immediate threat to the safety of the officers or others

3. Whether the suspect is actively resisting

4. Whether the suspect is attempting to evade arrest by flight

## IRRELEVANT FACTORS:

1. Intent or motivation of the Officer

2. Facts discovered after the event

3. Policy Violations

4. Officer's pre-seizure conduct



| EUCLID POLICE DEPARTMENT POLICY/PROCEDURE | | 16-001-419 |
|---|---|---|
| TITLE | | EFF DATE |
| #419 - Use of Force and Firearms | | December 21, 2016 |

## Purpose

The purpose of this procedure is to provide police officers with guidelines on the use of force, to include deadly force, and the use of firearms, as well as to satisfy the requirements of section 109.801 of the Ohio Revised Code and Section 109-2-1-4(D) of the Ohio Administrative Code as they relate to the firearms training, testing, and requalification of law enforcement officers.

## Policy Statement

Police officers are daily confronted with situations where control of individuals must be exercised to affect arrest and/or to protect the general public from harm or property loss. The use of reasonable physical force may be necessary in situations which cannot otherwise be controlled.

Confrontation is dynamic. Police response must be likewise flexible and predicated largely on the actions of the suspect. Force options available to police officers fall within a continuum ranging from the inherently coercive nature of the presence of a uniformed police officer to the use of deadly force. Just as the circumstances of an incident can change, the level of force that is reasonable in response will change. The "Use of Force Continuum" is not a step-by-step procedure. It is not required that all lower steps in the continuum be attempted before increasingly forceful measures may be used; rather it is a concept reflecting the dynamic nature of physical confrontation and appropriate police response to it.

It is the policy of the Euclid Police Department that officers may use only the degree of force which is reasonably necessary to effect lawful objectives including, *but not limited to,* effecting a lawful arrest or overcoming resistance to a lawful arrest, preventing the escape of an offender, or protecting or defending others or themselves from physical harm. Officers shall base their actions and the degree of force they use upon the degree of resistance encountered from the suspect.

In the most extreme of circumstances, officers may be required to use deadly force to protect their own life or the life of another person.

Since the use of deadly force is the most serious act in which a police officer will be engaged, the officer must act within the guidelines set forth below as well as within the bounds of good judgment, legal standards, ethical conduct and proper training.

It is the policy of the Euclid Police Department that the preservation of human life is of the highest value. Therefore, officers must have an objectively reasonable belief that deadly force is necessary to protect life before using deadly force. Deadly force may be used only under the following circumstances:

To defend himself or herself from serious physical injury or death.

72



EUCLID_DISCOVERY_001241

# USE OF FORCE POLICY

It is the policy of the Euclid Police Department that officers may use only the degree of force which is reasonably necessary to effect lawful objectives including, *but not limited to:*

1. *effecting a lawful arrest or overcoming resistance to a lawful arrest*

2. *preventing the escape of an offender*

3. *or protecting or defending others or themselves from physical harm.*

Officers shall base their actions and the degree of force they use upon the degree of resistance encountered from the suspect.



EUCLID_DISCOVERY_001242

# PURPOSE FOR USING FORCE

The sole purpose for any use of force by a Police Officer is to gain compliance. Compliance does NOT always mean affecting an arrest.

## FACTORS TO CONSIDER

1. The Amount of Time available to handle a certain situation

2. The severity of the situation and the circumstances surrounding it.

3. The amount of resources available and manpower available to you in that moment

4. What is the amount of force objectively reasonable for this situation

5. What additional tools do I currently have to resolve my situation through de-escalation or through the least amount of physical force necessary while keeping myself and others around me safe



EUCLID_DISCOVERY_001243

# ADDITIONAL APPROVED TOOLS

*EPD Policies and Procedures*
*Appendix A – Authorized Equipment – 12/13/07*

The following equipment has been authorized by the Chief of Police. Whenever any of the listed items are used in the line of duty an "Incident Report" will be completed and supplement by the officer using the equipment will be forwarded. , unless the officer using the equipment is the officer completing the Incident Report.

1. Handcuffs
2. Leg irons
3. Flex cuffs
4. Hobbles
5. TASER
6. Straight baton, 18-26 inches in length
7. ASP Tactical Baton (also known as an "expandable" baton)
8. Oleoresin Capsicum pepper spray, 10% or less as approved by the Chief of Police
9. "Pepper ball" gun
10. A folding, lock blade knife
11. Any equipment authorized by the Chief of Police for experimental or specialized use



EUCLID_DISCOVERY_001244

# THE USE OF UNARMED STRIKES

Strikes can be a valuable tool for an Officer's tool box.

- Strikes can be a quick reaction to an attacking suspect to slow them down
- Strikes can be used to stun the suspect in attempt to do something more substantial to apprehend them
- Strikes can be used to quickly create space between the Officer and the suspect.

There are a variety of strikes and striking surfaces an Officer can use. These can include *open hands, closed hands, hammer fists, knife hands, thrusts or punches.*

Target areas for these strikes will vary as well. These can include *pressure points, muscular areas, or the face/head* if necessary.

**Strikes are NOT intended to SOLELY subdue a suspect during a struggle to apprehend them.**



EUCLID_DISCOVERY_001245

EUCLID_DISCOVERY_001245

# UNARMED STRIKES TO THE HEAD

| ADVANTAGES | DISADVANTAGES |
|---|---|
| - Can be a very effective technique to stun a suspect in preparation for follow on techniques to aid in apprehension. | - Due to composition of the hand & minimal training, injuring the hand is likely. |
| - Can be used in tight quarters to help create space | - According to Cleveland's Department of Public Health, there were over 13,000 reports of disease in 2016. This does NOT count HIV reports or residents of Euclid! |
| - Can be effective against a target with minimal apparent vulnerabilities depending on suspect's distance, body position, and actions. | - Strikes to the face will cause a greater amount of cosmetic damage including bleeding and bruising |
|  | - Creates a much more difficult situation for the Department in the Battle of Public Perception. |



EUCLID_DISCOVERY_001246

# COMMON PRESSURE POINTS



Mastoid Process

Pressure Point on the Hand

Pressure Points on the Foot

Ulnar Nerve

Peroneal Nerve

Jugular Notch

Femoral Nerve

Infraorbital

Brachial Plexus (Tie In)

Radial Nerve



EUCLID_DISCOVERY_001247

EUCLID_DISCOVERY_001247



# ACTION-RESPONSE CONTINUUM

## INDIVIDUAL'S ACTIONS

Not Responding to Commands
Verbal or Physical Danger Cues

Refusing to Move - Dead Weight
Pulling Away From Officer

Pushing Officer
Wrestling With Officer

Striking or Kicking Officer

Life Threatening Weaponless Assaults
Attempting to Disarm Officer
Weapons Used Against Officer

## OFFICER'S RESPONSES

Officer Presence
Verbal or Physical Commands
Escort Position
Balance Displacement
Assistance From Other Officers

Take Downs, Joint Manipulations
or Pressure Points
Striking Muscle Groups

Aerosols or Electrical Devices
Baton Restraints
Striking, Punching, Kicking

Baton Techniques or
Sleeper Holds

Deadly Force

© Copyright 1991 Samuel Faulkner



EUCLID_DISCOVERY_001248

# YOU DECIDE???

*THE BASICS*

A single Officer arrives on scene to a domestic dispute.

The Officer enters the home, occupied by at least 2 people.

https://www.youtube.com/watch?time_continue=14&v=51jGdpKB2Ls

Were the Officers' actions justified?

Did they act to quickly?

Were there other options available?



EUCLID_DISCOVERY_001249

EUCLID_DISCOVERY_001249

# Officer Response to Resistance
## POC Codes for Reports

| Code | Description | | Code | Description |
|---|---|---|---|---|
| 8919 | Unarmed Tactics | | 8919E | Pepperball |
| 8919L | Joint Manipulation | | 8919H | Firearm Display |
| 8919M | Arm/Hand Strikes | | 8919J | Firearm Discharge |
| 8919N | Foot/Leg Strikes | | | |
| 8919P | Takedowns | | 8919K | Specialty Munitions |
| 8919Q | Ground Stabilization | | 8949F | Impact Round |
| 8919R | Restraint Techniques | | | |
| 8919S | Noncompliant handcuffing | | 8929D | K9 Narcotics Auto Search |
| 8919T | Verbal Commands | | 8929E | K9 Narcotics Building Search |
| | | | 8929F | K9 Building Search |
| 8919G | OC Spray | | 8929G | K9 Tracking |
| | | | 8929H | K9 Apprehension Bite |
| 8919A | Taser Display | | 8929J | K9 Apprehension No Bit |
| 8919B | Taser Drive Stun | | 8929K | K9 Cover During Arrest |
| 8919C | Taser Cartridge | | 8929L | K9 Mutual Aid |
| 8919D | Impact/Baton Strikes | | 8929M | K9 Crowd Control |
| 8919D | Impact/Baton Restraint | | | |



EUCLID_DISCOVERY_001260

# EUCLID POLICE DEPARTMENT RESPONSE TO RESISTANCE REPORT

(Euclid Police Department "Response to Resistance Report" form — largely illegible due to rotation and low resolution. Sections visible include: SUSPECT INFORMATION, OFFICER INFORMATION, SUSPECT AGGRESSIVE ACTIONS, SUSPECT PASSIVE ACTIONS, OFFICER RESPONSE, INJURIES / EXPLANATION / COMMENTS, DECISION SUBJECT, EFFECTS ON OTHERS, RESISTANCE, TIME TO EFFECT, DURATION OF EFFECTS, OVERALL EFFECT, with checkboxes. PEPPERBALL / OC and ADMIN noted.)



EUCLID_DISCOVERY_001251





EUCLID_DISCOVERY_001262

EUCLID_DISCOVERY_001262

# ARTICULATING THE FACTS

*PAINTING THE PICTURE* 

The narrative of the report should paint the picture of what exactly occurred. The Use of Force Form makes a great checklist to ensure the form and narrative matches.

## Utilize the 5 Ws & H

**WHO** – Who exactly was involved in the incident. This includes others who may have been around the area as well – especially if they are directly involved.

**WHAT** – What is taking place between you and the suspect as well as what is going on around you at that time. This helps explain the urgency of action, seriousness of the situation, etc.

**WHERE** – Where exactly did every piece of your story take place and the setting that it was in. Low light, noisy, crowded, etc.

**WHEN** – Explain the timeframe of events and actions of the suspect

**WHY** – List the motives of the suspect if known. List details of why they were trying to do what they did to help justify your actions

**HOW** – How did they behave and what exactly were those actions. This requires more detail than one word like "resisted."



EUCLID_DISCOVERY_001253

# ARTICULATING THE FACTS

*PAINTING THE PICTURE*

Explain in detail what the suspect(s) did to resist Officers.

"Police instructed the male to place his hands behind his back, but he resisted"

"Police instructed the male to place his hands behind his back, but he pulled his arms to the front of his chest and clenched his fists while screaming, "Fuck you, I'm not doing shit!"

"The suspect refused to comply with commands and became aggressive with Police."

"Police advised the male several times to stop yelling, but he continued. The male then began gritting his teeth as he spoke and began clenching his fists while flexing his arms."

"The suspect refused to move and just sat on the ground"

"The suspect conspicuously ignored my instructions in order to buy time and kept quickly looking around trying to find a way to escape"



EUCLID_DISCOVERY_001254

# ARTICULATING THE FACTS

## PAINTING THE PICTURE



Explain in detail what actions the Officer(s) did to combat the suspect(s) actions as well as the reasoning behind them.

"I used repeated closed fisted strikes to the suspect's shoulder and arm in attempt to pull the arm out in order to handcuff him."

"I placed my baton inside the suspect's curled arm and pried it out from underneath him in order to handcuff him."

"The suspect attempted to pull his arm away from me and began leaning to his right trying to get away. I continued to give loud verbal commands to comply and I used my taser in order to gain momentary compliance and handcuff him."

"The suspect moved aggressively toward me and refused to comply with my continued commands to stop. I quickly struck the suspect in the face in attempt to stun him and create space.

"I attempted to move the suspect to the other side of the room. He continued to jerk away from me so I placed him in an armbar and took him to the ground to prevent him from attacking his wife again."



EUCLID_DISCOVERY_001255

# ARTICULATING THE FACTS

## PAINTING THE PICTURE

Make sure the narrative matches the video! At the same time, don't depend on video alone. Sometimes, it will paint a totally different picture because of its inability to capture everything.



*"Police observed that the vehicle had not rear license plate illumination and conducted a traffic stop."*

*"The vehicle only had one functional head light so Police executed a traffic stop."*



### Cincinnati University Officer Ray Tensing Traffic Stop Video

https://www.youtube.com/watch?v=HPl1k2Emds

Officer Tensing's testimony was that he was dragged by the vehicle and the only thing he could see to do was to take a head shot to stop the vehicle.



EUCLID_DISCOVERY_001256

# CONCLUSION

## *Key Points to Remember*

Be familiar with our Use of Force Policy. It is YOUR responsibility to know what we can and can't do or what we can and can't use.

Stay current on your Case Law. Understand what standards have already been set and know where to go if you have questions.

Stay comfortable with ALL of the tools you have available to use in a confrontation – especially their placement and serviceability.

Prepare yourself both technically and through physical conditioning to handle situations on the street with the appropriate level of force needed to resolve the situation and to keep you safe.

Take the time to clearly "Paint the picture" of the events that occur during an encounter. Explain both sides in detail and complete the necessary forms as accurately as possible.

Don't depend on video to tell the story. Many times, video can paint a different image than the reality of the situation.



EUCLID_DISCOVERY_001257