UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

------------------------------------------------------------

:
:
MARY STEWART,                                    :
*as Administrator of the Estate of*              :      Case No. 1:17-cv-2122
LUKE O. STEWART, SR., *Deceased*                 :
:
          Plaintiff,                             :
:
vs.                                              :      OPINION & ORDER
:      [Resolving Docs. 12, 38]
CITY OF EUCLID, *et al.*,                        :
:
          Defendants.                            :

------------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On March 13, 2017, Euclid police officer Matthew Rhodes shot and killed Luke Stewart Sr. ("Stewart") during a traffic stop.[1]  His mother, Mary Stewart, now sues Officer Rhodes and Officer Louis Catalani (who was also on the scene) on behalf of Stewart's estate.[2]  She contends that the officers violated Stewart's constitutional and state-law rights and that those violations caused Stewart's death.[3]  She also brings a *Monell*[4] claim against the City of Euclid.[5]  Finally, Mary Stewart also brings a state-law survivorship action.[6]  All three defendants have moved for summary judgment.[7]

For the reasons that follow, the Court **GRANTS** the Defendants' motion for summary judgment.

## I. BACKGROUND

Because this case is at the summary judgment stage, the Court recites the facts in the light most favorable to the Plaintiff, resolving factual disputes and drawing reasonable inferences in

---

[1] Doc. 12-1 at 50, 52–53, 60.
[2] Doc. 1 at ¶¶ 31–33, 50–65.
[3] *Id.*
[4] *Monell v. Dep't. of Soc. Servs. of the City of N.Y.*, 436 U.S. 658 (1978).
[5] Doc. 1 at ¶¶ 34–49.
[6] *Id.* at ¶¶ 66–69.
[7] Doc. 12.  Plaintiff Mary Stewart opposes.  Doc. 22.  Defendants reply.  Doc. 30.

Plaintiff's favor.[8]  Moreover, in evaluating the parties' evidence, the Court is mindful of the fact that Decedent Luke Stewart cannot testify as to his version of what happened on March 13, 2017.  This recitation of facts is for summary judgment purposes only and is not intended to express any opinion as to what the trial evidence might have shown.

### A. Officer Catalani Responds to a Suspicious Vehicle Report

At around 6:50 a.m. on Monday, March 13, 2017, a Euclid resident called the Euclid Police Department.[9]  She told the police that there was a "creepy looking car . . . parked outside" her house on South Lake Shore.[10]  The resident described the car as a "black Honda" with windows that were so dark that she could not tell whether the car was occupied.[11]  She told the police that the car had been sitting outside with its parking lights on for around twenty minutes.[12]

Defendant Officers Rhodes and Catalani were dispatched to the South Lake Shore location.[13]  Catalani was the first to arrive to the scene.[14]  He drove by the Honda that the resident had described, observing that the running lights were on.[15]  Window tinting prevented Officer Catalani from seeing inside the vehicle.[16]

Defendant Officer Catalani parked his patrol vehicle about ten feet behind and slightly to the left of the Honda.[17]  He trained his spotlight and takedown lights on the vehicle, then exited his vehicle and approached the vehicle on foot.[18]  Despite a departmental policy requiring him to do so, Catalani did not activate his patrol vehicle's dashboard camera or his belt microphone.[19]

---

[8] *See Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013).
[9] Doc. 12-1 at 51.
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.* at 52–53.
[15] Doc. 14 at 39.
[16] *Id.* at 39–40.
[17] *Id* at 40.
[18] *Id.* at 41, 51.
[19] *See id.* at 34–37.  This despite the fact that the dash camera could be activated from the belt microphone.  Doc. 15 at 75.

Upon reaching the vehicle, Catalani observed Luke Stewart in the driver's seat.[20]  Officer Catalani shined his flashlight into the Honda, but Stewart did not react.[21]  Catalani observed a digital scale in the center console,[22] what he believed to be a half-burnt marijuana blunt in the passenger's seat,[23] and something that appeared to be the screw-on cap to a wine bottle near Stewart's feet.[24]  Catalani observed that the keys were in the ignition but that the engine was not running.[25]  Catalani did not see any weapons in the car.[26]

Catalani ran the Honda's license plate and discovered the car was registered to an older man with an active arrest warrant issued against the registered car owner.[27]  But Catalani thought Luke Stewart looked too young to be the owner.[28]

## B. Officer Rhodes Arrives and Stewart Begins to Flee

Defendant Officer Rhodes heard the dispatch call at the same time as Officer Catalani.[29]  At the time, he was having breakfast with two other officers.[30]  As Rhodes made his way to the scene, Officer Catalani radioed to say: "[O]nce you get here, we're goina [sic], uh, end up pulling this guy out."[31]

---

[20] *See* Doc. 14 at 41, 43.

[21] *Id.* at 42.

[22] *Id.*  Officer Catalani also testified that there appeared to be drug residue on the scale.  Doc. 14 at 42, 44–45.  But he made no mention of any residue in his interview with agents from the Ohio Bureau of Criminal Investigation (BCI).  Doc. 12-1 at 53.  Viewing the evidence in the light most favorable to the plaintiff, the Court will proceed as if Catalani saw no residue on the scale.  Plaintiff Mary Stewart also points out that Catalani's deposition testimony indicated that the scale was "black or silver," whereas he described the scale as "silver" to the BCI agent.  *Compare* Doc. 14 at 44 *with* Doc. 12-1 at 53.  This seems to have been an attempt to conform his testimony to the physical evidence, because the scale found in Stewart's car was apparently black (though it is tough to tell from the photographic evidence submitted).  *See* Doc. 22 at 7; Doc. 14 at 189; Doc. 12-1 at 83.  In any event, Plaintiff does not appear to contest that Catalani saw a scale and, even if he didn't, that would not change the Court's analysis.

[23] Doc. 14 at 42.

[24] *Id.*  Plaintiff Mary Stewart argues that Luke Stewart's legs would have blocked Catalani's view of the wine cap.  Doc. 22 at 7.  But the mere fact that Stewart's legs were extended into the footwell area of the car, Doc. 14 at 43, does not necessarily mean that Officer Catalani could not see the wine cap.  In any event, whether Catalani could see the cap does not affect the Court's analysis in this opinion.

[25] *Id.* at 46.

[26] *Id.* at 48.

[27] *Id.* at 46.

[28] *Id.* at 59; Doc. 12-1 at 52.

[29] *See id.*

[30] *See* Doc. 15 at 48.

[31] *Id.* at 50; Doc. 12-1 at 52.

After arriving on the scene, Rhodes briefly discussed the situation with Catalani before moving his car in front of Stewart's Honda to prevent it from escaping.[32]  Neither officer activated his overhead lights.[33]  But Officer Rhodes did direct both his spotlight and takedown lights at the Honda.[34]  Rhodes admitted that these lights could blind a car's driver.[35]  Rhodes also did not activate his dashboard camera and forgot his belt microphone in his patrol vehicle.[36]

Both officers approached the Honda—Officer Catalani approached on the driver's side, Officer Rhodes approached on the passenger side.[37]  Officer Catalani knocked on the driver's window, waved, and said "hi."[38]  Catalani did not announce himself as a police officer.[39]

According to Officer Catalani, Stewart looked out the window and waved back.[40]  Stewart then started sitting up in the seat and went immediately to start the car.[41]  He started the engine.[42]

At that point and according to Defendant Officer Catalani, Catalani yelled: "No. No. No. Stop. Stop. Stop."[43]  Catalani grabbed the door handle and opened the driver's side door.[44]  He grabbed Stewart's left arm and tried to pull him away from the gearshift and out of the vehicle.[45]  Stewart began yelling.[46]  Officer Catalani then reached around Stewart's head with his right arm in an attempt to grab a pressure point under Stewart's jaw.[47]  Catalani continued trying to pull Stewart

---

[32] Doc. 15 at 59–62; Doc. 14 at 70–72.

[33] *See* Doc. 14 at 61, 76.

[34] *Id.* at 76.

[35] Doc. 15 at 79.  Defendant Officer Rhodes asserted, however, that the tinting on the Honda would have prevented the lights from blinding Stewart.  *Id.* at 80.  But the Honda's windows do not appear unusually dark in the BCI report photos.  Doc. 12-1 at 65.

[36] Doc. 15 at 73–74.  Officer Rhodes' deposition seems to suggest that he thought about turning on the camera before leaving his vehicle, but did not do so.  *Id.*

[37] Doc. 14 at 73.

[38] *Id.* at 74.

[39] *Id.*  Officer Rhodes testified at his deposition that he heard Stewart say "police" around this time, Doc. 15 at 84, but Catalani makes no mention of that.

[40] Doc. 14 at 75.

[41] *Id.* at 80.

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.* at 81.

[46] *Id.* at 82.

[47] *Id.*

out of the car with his left hand.[48]  Throughout all this, Catalani's body (except for his arm) remained

outside the vehicle.[49]

      While Catalani struggled with Stewart on the Honda's driver's side, Defendant Officer Rhodes

opened the passenger side door and began attempting to push Stewart out of the car.[50]  Bracing his

knees on the passenger seat, Rhodes leaned into the Honda and pushed on Stewart's side and

shoulder.[51]  Rhodes initially pushed with his feet on the ground, but in the course of pushing Stewart

he moved further into the car, resting his knees on the passenger seat and allowing his feet and lower

legs to hang outside the car.[52]  Meanwhile, Stewart was reaching for the gearshift.[53]

## C. Officer Rhodes Becomes Trapped in the Fleeing Car

      According to Officer Rhodes, his and Catalani's push-pull routine was working—until Stewart

got the car in gear.[54]  Then the car began moving forward and Stewart drove his vehicle into Rhodes'

patrol vehicle.[55]  While Officer Catalani testified that the Honda struck Rhodes' vehicle "pretty

hard,"[56] Officer Rhodes testified that he does not remember either falling forward or hitting the

dashboard as a result of the impact.[57]

      Officer Rhodes struggled with Stewart for control of the gearshift.[58]  Rhodes tried to put the

gearshift into park; Stewart tried to keep the gearshift in reverse to back away from Rhode's damaged

patrol vehicle.[59]  But Stewart was able to get the car into reverse and back up enough to allow him

to get around Rhodes' patrol vehicle.[60]

---

[48] *Id.* at 83–84.
[49] *Id.* at 84.
[50] Doc. 15 at 85–86.
[51] *Id.* at 107.
[52] *Id.* at 109–10.
[53] *Id.* at 108.
[54] *Id.* at 108.
[55] Doc. 14 at 94.
[56] *Id.* at 105.
[57] Doc. 15 at 112.
[58] *Id.* at 112.
[59] *See id.* at 113–15.
[60] *Id.* at 112–21.  There is some discrepancy in the Defendant Officers' accounts of events at this point.  Officer Rhodes, as related above, testified that Stewart was able to get the car in reverse, then shift gears again and go around the patrol vehicle.  *See id.*  Officer Catalani testified that the impact with the Honda caused Rhodes' patrol vehicle to roll

After pulling away from the collision with Rhodes patrol vehicle, Stewart began to drive the Honda east on South Lake Shore.[61]  As the Honda passed Rhodes' patrol vehicle, Defendant Officer Rhodes pulled himself fully into the car to avoid his legs from becoming pinned.[62]  The passenger-side door closed behind him.[63]

Meanwhile, Officer Catalani was moving alongside the driver's side of the vehicle Stewart was driving.[64]  Although Stewart angled the car in Catalani's direction to drive around Rhodes' vehicle, Catalani was alongside but not in front of the car.[65]

As the Honda made its way east, a white SUV was travelling west on South Lake Shore.[66]  Defendant Officer Catalani was forced to step back from the Honda to avoid being hit by the SUV.[67]  However, Catalani followed  the vehicle on foot, radioing dispatch that "the vehicle ha[d] taken off and tried to run us over."[68]  Catalani testified that the Honda was travelling at about twenty-five miles per hour down South Lake Shore.[69]

Up to this point, Stewart had made no attempt to strike either of the Defendant Officers.[70]  Indeed, Stewart was just driving and looked at Rhodes to ask: "Why are you in my car?"[71]  Rhodes

---

backwards, allowing Stewart to drive away.  Doc. 14 at 105–07.  It may have been some combination of both, because it is undisputed that Catalani's patrol vehicle was parked further from the Honda than Rhodes'.  Doc. 15 at 62–63; Doc. 14 at 40.  This dispute, however, has no bearing on the resolution of the case.

[61] Id. at 109.  We will never know exactly why Stewart chose to flee in this case.  It could be that he was blinded by the lights on his vehicle and did not realize at first that the people trying to remove him from the car were police officers.  He was also well over the legal limit for alcohol consumption while operating a motor vehicle and under the influence of cocaine, Doc. 12-1 at 88, so he may not have been thinking rationally or have feared prosecution.  Or he might have fled as a result of his previous encounters with other police officers.  Id. at 76–80.  In any event, Stewart's reasons for fleeing do not impact the outcome of this case, particularly because there is no real evidence that Officers Rhodes and Catalani were aware of his level of intoxication or criminal history.  (That said, Catalani apparently suspected that Stewart might be passed out because of the blunt, cap, and alleged residue on the scale—though, as discussed above, the Court discounts this latter observation—he thought he saw in the Honda.  Doc. 14 at 47–50.)

[62] Doc. 15 at 121–22.
[63] Id. at 120–21.
[64] Doc. 14 at 94, 109.
[65] Id. at 103–05.
[66] Id. at 109.
[67] Id.
[68] Id. at 113.
[69] Id.
[70] Id. at 104; Doc. 15 at 125.
[71] Id. at 123.

yelled in response, but doesn't remember what he specifically said.[72]

### D. The Car Briefly Stops

Inside the Honda, Officer Rhodes was attempting to get control of the gearshift and keys.[73] He began punching Stewart in the head.[74]  Defendant Officer Rhodes testified that Stewart did not react to being punched, other than to say "Na n****" every time he was hit.[75]  Rhodes testified that he was saying things to or yelling at Stewart as he struck Stewart, but does not remember what he was yelling.[76]  Stewart did not attempt to defend himself.[77]  Rhodes believes he struck Stewart three times.[78]

Officer Rhodes did not attempt to remove Stewart's arm from the gearshift.[79]  Nor did he attempt to use the emergency brake,[80] even though it was next to the gearshift that Rhodes was fighting with Stewart to control.[81]

At one point, Officer Rhodes grabbed the keys, but they would not come out of the ignition because the vehicle was not in park.[82]

As the car proceeded down South Lake Shore, Officer Rhodes was apparently able to get the car into neutral several times.[83]  When he did, he would reach up to try to turn the car off.[84]  But as he reached up from the gear shift to turn the car off, Stewart would shift the car back in drive and they would continue down the street.[85]

Eventually Rhodes pulled out his Taser and shot Stewart with it.[86]  Stewart called out "Ah!"

---

[72] *Id.*
[73] *Id.* at 129–30.
[74] *Id.* at 130.
[75] *Id.*
[76] *Id.* at 135.
[77] *Id.*
[78] *Id.* at 138.
[79] *Id.* at 132.
[80] *See id.* at 136.
[81] Doc. 14 at 189–90.
[82] Doc. 15 at 133–34.
[83] *Id.* at 139–40.
[84] *Id.* at 140.
[85] *Id.*
[86] *Id.* at 144.

and said: "you shot me."[87] The Taser apparently had no other effect.[88] Then the Taser stopped making noise.[89] Officer Rhodes discovered the safety on the Taser had re-engaged.[90] He turned the safety off and pulled the trigger five additional times.[91] It had no additional effect.[92]

Defendant Officer Rhodes' Taser was equipped with a "drive-stun" feature that would have allowed the officer to use the body of the Taser (rather than the prongs deployed when the Taser is fired like a gun) to administer an electrical shock to Stewart.[93] But Rhodes did not use this feature.[94] Nor did he deploy pepper spray.[95]

Instead, when the Taser prongs proved ineffective, Officer Rhodes began hitting Stewart in the head with the Taser.[96] Stewart merely jerked and said "naw, n****."[97] Stewart swatted at Officer Rhodes or pushed him away in a defensive fashion, but not with a closed fist.[98]

Notwithstanding the ineffectiveness of the Taser (both as a method of applying electric shocks and as a club), the Honda came to a stop in the intersection between South Lake Shore and East 222nd Street while making a left-hand turn.[99] Rhodes believes that he was thrown into the dashboard, but doesn't "remember exactly."[100] At this point, Rhodes got the car into neutral and shut off the engine.[101] But he still could not get the keys out of the ignition.[102]

Officer Rhodes testified that he did not know why the car stopped, but thought they had hit

---

[87] *Id.* at 144.
[88] *See id.*
[89] *Id.* at 145.
[90] *Id.*
[91] *See id.* at 145, 150.
[92] *Id.* at 145.
[93] *Id.* at 149, 202; Axon, *TASER X26EEE ECD User Manual* 17–18 (2011) (hereinafter "User Manual"). While the Taser user manual cited in this opinion was not submitted into the record by the parties, the Court uses it primarily to explain the functions of a Taser (particularly those mentioned by the parties but not explained in their filings).
[94] Doc. 15 at 149.
[95] *Id.* at 150.
[96] *Id.* at 157–58.
[97] *Id.*
[98] *See id.* at 161.
[99] *Id.* at 153; Doc. 14 at 126, 135.
[100] Doc. 15 at 159–60. Officer Rhodes testified that he lost his Taser at this point, *id.*, but that contradicts his statement to the BCI, Doc. 12-1 at 59–60.
[101] Doc. 15 at 153.
[102] *Id.*

another vehicle.[103]  Officer Catalani was still pursuing the vehicle on foot, however, and testified that the car never hit anything.[104]

    While the car was stopped at the intersection, Defendant Officer Catalani caught up to the vehicle.[105]  According to Catalani, there were cars operating on 222nd Street at the time.[106]  Catalani caught up to the Honda's in the ten to fifteen seconds the car was stopped.[107]

    Defendant Officer Rhodes saw Officer Catalani approach the vehicle.[108]  He also heard dispatch order the next shift of officers, who were located nearby at the station, to exit roll call to assist Rhodes and Catalani.[109]  But then Stewart got the car started again and began driving down 222nd Street just as Officer Catalani was about to put his hand on the door handle.[110]

### E. Officer Rhodes Decides to Use Deadly Force

    The Honda then proceeded down 222nd Street at twenty-five to thirty miles per hour.[111]  Officer Rhodes continued to unsuccessfully struggle with Stewart for control of the gearshift and the keys.[112]

    As they vied for vehicle control, the Honda went up over the curb and around a telephone pole before returning to the roadway.[113]  It mounted the curb again near the intersection of 222nd Street and Milton Avenue.[114]  Officer Rhodes was thrown forward and lost his Taser as they mounted the curb a second time and Stewart tried to push him forward, but Stewart made no attempt to strike Rhodes.[115]  At around the same time, Rhodes was able to get the vehicle into neutral again and the

---

[103] *Id.* at 155.
[104] *See* Doc. 14 at 155.
[105] *Id.* at 138.
[106] *Id.* at 139.
[107] *Id* at 137–40; *See* Doc. 15 at 156.
[108] *Id.* at 162.
[109] *Id.*
[110] *Id.* at 163, 165; *See* Doc. 14 at 137–38, 151.  Officer Rhodes testified that it appeared to him as if Catalani attempted to open the Honda's driver side door, but that it would not open.  Doc. 15 at 162.
[111] *Id.* at 151.
[112] Doc. 12-1 at 60.
[113] Doc. 15 at 166; Doc. 14 at 151.
[114] Doc. 15 at 168.
[115] *Id.* at 168–69; Doc. 12-1 at 60.

vehicle had come to a stop.[116]  Nonetheless, Stewart continued to rev the engine.[117]

It was at this point that Defendant Officer Rhodes chose to use deadly force.[118]  Rhodes shot Stewart twice in the torso with his service weapon.[119]  Stewart looked at Rhodes, said "Naw, n****," and attempted to strike him.[120]  Rhodes fired his weapon three additional times, striking Stewart in the neck, chest, and wrist.[121]

Rhodes then attempted to exit the Honda, but the passenger door would not open.[122]  After he kicked the door several times, he was able to open the door and exit.[123]

A later BCI investigation revealed that, by the end of Rhodes and Stewart's struggle, the Honda could no longer be shifted into drive.[124]

## F. Procedural History

In October 2017, Plaintiff Mary Stewart, on behalf of Luke Stewart's estate, filed this lawsuit against Defendant Officers Rhodes and Catalani and the City of Euclid.[125]  She brings federal claims under 42 U.S.C. § 1983 against all three defendants, alleging that their conduct violated Stewart's constitutional rights.[126]  She also brings Ohio state law (1) wrongful death; (2) intentional infliction of emotional distress; (3) assault and battery; (4) willful, wanton, and reckless conduct; and (5) survivorship claims against Officers Rhodes and Catalani.[127]

All three Defendants move for summary judgment.[128]

---

[116] *See id.*
[117] *Id.*
[118] *See id.*
[119] Doc. 15 at 172.
[120] *Id.*
[121] *Id.* at 173, 175; *see* Doc. 12-1 at 81–82.
[122] Doc. 15 at 176–77.
[123] *Id.* at 177.
[124] Doc. 12-1 at 88.
[125] Doc. 1.
[126] *Id.* at ¶¶ 31–49.
[127] *Id.* at ¶¶ 50–69.
[128] Doc. 12.  Plaintiff opposes.  Doc. 22; Doc. 23; Doc. 25; Doc. 28; Doc. 29; Doc. 32.  Defendants reply.  Doc. 30; Doc. 31; Doc. 34.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is proper when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[129] The moving party must demonstrate this lack of any genuine dispute of fact.[130]

Once the moving party has done so, the non-moving party must set forth specific record facts—not mere allegations or denials in pleadings—showing a triable issue of fact.[131] The non-moving party must show more than some doubt as to the material facts in order to defeat a motion for summary judgment.[132] But the Court views the facts and all reasonable inferences from those facts in favor of the non-moving party.[133]

When parties present competing versions of the facts on summary judgment, a district court adopts the non-movant's version of the facts unless incontrovertible record evidence directly contradicts that version.[134] Otherwise, a district court does not weigh competing evidence or make credibility determinations.[135]

## III. ANALYSIS

### A. Constitutional Claims Against the Individual Officers

Defendant Officers Rhodes and Catalani argue that they are entitled to qualified immunity from Stewart's § 1983 claims.[136] The Court agrees.

#### 1. Qualified Immunity Standard

"Qualified immunity is intended to protect public officials from unnecessary interference with their duties, while also holding them accountable 'when they exercise power irresponsibly.'"[137] It

---

[129] *Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 580 (6th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).
[130] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[131] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).
[132] *Id.* at 586.
[133] *Killion*, 761 F.3d at 580 (internal citations omitted).
[134] *See Scott v. Harris*, 550 U.S. 372, 380 (2007).
[135] *Koren v. Ohio Bell Tel. Co.*, 894 F. Supp. 2d 1032, 1037 (N.D. Ohio 2012) (citing *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 470 (6th Cir. 2012)).
[136] Doc. 12 at 7–12.
[137] *Godawa v. Byrd*, 798 F.3d 457, 462 (6th Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

"gives government officials breathing room to make reasonable but mistaken judgments about open legal questions."[138] "When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'"[139]

"Public officials are entitled to qualified immunity from suits for civil damages if either [1] the official's conduct did not violate a constitutional right or [2] if that right was not clearly established at the time of the [official's] conduct."[140]

### 2. Constitutional Violation

#### a. Officer Catalani

Because Defendant Officer Catalani was not in the Honda and did not fire his weapon at Stewart, Plaintiff's claim against him is premised on the initial decision to pull Stewart out of the Honda on South Lake Shore.[141] She argues that this violated Stewart's Fourth Amendment right to be free from unreasonable seizure.[142] Viewing the evidence in the light most favorable to Plaintiff, she is mistaken.

Stewart was seized within the meaning of the Fourth Amendment when Defendant Officers Rhodes and Catalani attempted to remove him from his car. The question is whether that seizure was constitutionally permitted.

"Generally, the Fourth Amendment requires at least a 'reasonable suspicion' that an individual has committed a crime before the individual may be seized."[143] "Reasonable suspicion is more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person of criminal activity."[144] An officer performing an investigatory stop of a suspect must be able to point to "'specific and articulable facts which, taken together with rational

---

[138] *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

[139] *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

[140] *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017).

[141] Doc. 22 at 20–21.

[142] *Id.*

[143] *Bletz v. Gribble*, 641 F.3d 743, 755 (6th Cir. 2011); *see also Terry v. Ohio*, 392 U.S. 1 (1968).

[144] *United States v. Collazo*, 818 F.3d 247, 257 (6th Cir. 2016) (quoting *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008)).

inferences from those facts, reasonably warrant'" the stop and subsequent investigation.[145]

That said, "reasonable suspicion" is a quantum of evidence "considerably less than proof of wrongdoing by a preponderance of the evidence" and "obviously less demanding than that for probable cause."[146] "[R]easonable suspicion" may also be based on evidence that is "less reliable than that required to show probable cause."[147]

In this case, it is uncontested that Officer Catalani observed what he believed to be a marijuana blunt inside Stewart's vehicle.[148] As marijuana use is a criminal offense, that is sufficient to establish reasonable suspicion to stop Stewart and investigate further. It is true, as Plaintiff argues, that Catalani had not yet confirmed that what he saw was, in fact, a marijuana blunt.[149] But absolute certainty is not required even to establish probable cause, let alone reasonable suspicion. It is enough that Defendant Officer Catalani saw what appeared to be a blunt inside the vehicle.

Because he had reasonable suspicion to justify stopping Stewart, Officer Catalani could order Stewart out of his vehicle without any additional suspicion.[150]

The complicating factor in this case is that Officer Catalani does not seem to have ever actually *ordered* Stewart to exit the vehicle, because Stewart started the car and attempted to put it in gear before he did so. Stewart was, therefore, not defying any order to step out of the Honda.

But focusing on that fact ignores the fact that Stewart was attempting to flee the scene—or, at least, a reasonable officer could believe he was. He had, after all, started the engine.[151] Then, despite Officer Catalani's instruction to "stop," Stewart reached for the gearshift.[152] The Sixth Circuit has held that a police officer may use reasonable force to remove a suspect from his vehicle where that person

---

[145] *See Eisnnicher v. Bob Evans Farms Rest.*, 310 F. Supp. 2d 936, 946 (S.D. Ohio 2004) (quoting *Terry*, 392 U.S. at 21)).
[146] *See United States v. Sokolow*, 490 U.S. 1, 7 (1989).
[147] *Alabama v. White*, 496 U.S. 325, 330 (1990).
[148] Doc. 14 at 42.
[149] Doc. 22 at 20.
[150] *See Pennsylvania v. Mimms*, 434 U.S. 106 (1977); *see also Maryland v. Wilson*, 519 U.S. 408 (1997).
[151] Doc. 14 at 80.
[152] Doc. 15 at 107–08.

"refuse[s] to stop his vehicle despite a police officer's obvious indication that he should."[153]  The force used by Catalani in his interactions with Stewart on South Lake Shore were reasonable, albeit unsuccessful, efforts to remove a fleeing suspect from his vehicle.  The Court therefore finds that Catalani did not violate Stewart's rights.

It is true that Officer Catalani did not verbally identify himself as a police officer before attempting to remove Stewart from the Honda.[154]  It is also true that Catalani's command to "stop" may have been given as he opened the car door.[155]  And it may also be true that the lights from Catalani's and Rhodes' patrol vehicles temporarily blinded Stewart, preventing him from seeing that it was a police officer outside his window.[156]  But these facts do not affect the reasonableness of Catalani's conduct.

Fourth Amendment reasonableness is determined from the officer's perspective, not the suspect's.[157]  Defendant Officer Catalani had no way of knowing whether Stewart was blinded by the patrol vehicle lights, even if he was aware that it was possible.  For all Catalani knew, Stewart woke to find himself boxed in by two police vehicles[158] and with two fully uniformed police officers[159] outside his windows—circumstances that would suggest to any reasonable person that they were not free to leave—and decided to flee the scene.  And Catalani was not required to stand in place, allowing Stewart uninhibited access to the keys and gearshift, while he identified himself and ordered Stewart to stop.  He could—and did—take reasonable steps to prevent Stewart from driving away as soon as it appeared that Stewart would attempt to flee.

Plaintiff argues that, all of that notwithstanding, Officer Catalani's conduct was unconstitutional because he intended to use physical force to remove Stewart from the vehicle long

---

[153] *Hayden v. Green*, 640 F.3d 150, 153–54 (6th Cir. 2011).
[154] Doc. 14 at 74.
[155] *Id.* at 80–81.
[156] *Id.* at 61–62, 76; Doc. 15 at 79.
[157] *Hayden*, 640 F.3d at 153 ("We decide [whether an officer used excessive force] based on 'the perspective of a reasonable officer on the scene . . . .'" (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989))).
[158] Doc. 14 at 40; Doc. 15 at 62.
[159] Doc. 12-1 at 4, 14.

before Stewart gave him any cause to do so.[160]  She bases her argument on Catalani's radio dispatch informing Rhodes that "we're goina [sic], uh, end up pulling this guy out."[161]

But an officer's subjective intent is not relevant to the Court's Fourth Amendment analysis, so long as the officer's conduct was otherwise justified.[162]  In other words, because Stewart gave Officer Catalani a valid, Fourth-Amendment-compliant reason to remove him from the Honda, the fact that Catalani might have otherwise intended to do does not matter in a legal sense.  This is not to say that such an intention, if Officer Catalani possessed it, is not problematic in a moral sense; only that it does not affect the outcome of this case.

### b. Officer Rhodes

Plaintiff contends that Defendant Officer Rhodes violated Stewart's constitutional rights in two ways.

### i. Initial Stop

First Plaintiff contends that, like Defendant Officer Catalani, Rhodes violated Stewart's rights during the initial stop on South Lake Shore.[163]  The Court rejects this claim for largely the same reasons it rejected the same claim as to Officer Catalani:  Rhodes acted reasonably in attempting to remove an apparently fleeing suspect from the Honda.  While there may have been wiser means of doing so than entering the vehicle from the passenger side, the Court cannot say Rhodes' effort to prevent Stewart's flight during the initial stop was unreasonable.

### ii. Use of Deadly Force

Second, Plaintiff contends that Officer Rhodes used unconstitutionally excessive force when he fatally shot Stewart on 222nd Street.[164]  Although it is a close and difficult question, the Court

---

[160] Doc. 22 at 20.
[161] Doc. 12-1 at 52.
[162] *Cf. Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").
[163] Doc. 22 at 20–21.
[164] *Id.* at 17–20.

ultimately concludes that Rhodes did not use unconstitutionally excessive force.

### General Legal Standard

The Fourth Amendment limits the amount of force a police officer may employ to detain a suspect.[165] The test for excessive force is "whether the officer['s] actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."[166] Objective reasonableness is assessed from the point of view of the officer at the time of the use of force, not with the benefit of hindsight or evidence that later investigations reveal about the circumstances the officer faced.[167]

"In determining reasonableness, a court allows for the fact that police officers are often forced to make split-second judgments about the amount of force that is necessary in a particular situation, in 'tense, uncertain, and rapidly evolving circumstances.'"[168] A court should "never allow the theoretical, sanitized world of [its] imagination to replace the dangerous and complex world policemen face every day."[169] "What constitutes 'reasonable action' may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure."[170]

An officer is justified in using deadly force on a fleeing suspect only where he has probable cause to believe that the suspect presents an immediate threat of physical harm to the officer or others.[171]

### The Segmented Approach

Additionally, the Sixth Circuit has held that courts must use a "segmented analysis" to

---

[165] *Papp v. Snyder*, 81 F. Supp. 2d 852, 856 (N.D. Ohio 2000).
[166] *Cass v. City of Dayton*, 770 F.3d 368, 374 (6th Cir. 2014) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).
[167] *Id.* at 375.
[168] *Jones v. Beatty*, 4 F. Supp. 2d 737, 743 (N.D. Ohio 1998) (quoting *Graham*, 490 U.S. at 396)).
[169] *Id.* at 743–44 (quoting *Smith v. Freland*, 954 F.2d 343, 345 (6th Cir. 1992)).
[170] *Id.* at 744. (quoting *Smith*, 954 F.2d at 345).
[171] *Chappell v. City of Cleveland*, 585 F.3d 901, 908 (6th Cir. 2009) (quoting the district court below and *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

determine whether an officer properly used deadly force.[172]  In other words, the Court must focus on "the totality of the circumstances facing" Defendant Officer Rhodes "at the time [he] made [his] split second judgments immediately prior to using deadly force."[173]  "Because it is the reasonableness" of that use of force "that is the issue, not the reasonableness of [Rhodes'] conduct in time segments leading up to" the use of force, the Court cannot consider whether Rhodes acted reasonably in those earlier time periods in determining whether he properly used deadly force in this case.[174]

The Sixth Circuit justified its "segmented approach" in *Dickerson v. McClellan*,[175] explaining that:

> The time-frame is a crucial aspect of excessive force cases. Other than random attacks, all such cases begin with the decision of a police officer to do something, to help, to arrest, to inquire. If the officer had decided to do nothing, then no force would have been used. In this sense, the police officer always causes the trouble. But it is trouble which the police officer is sworn to cause, which society pays him to cause and which, if kept within constitutional limits, society praises the officer for causing.

The Sixth Circuit has applied the segmented approach even where a plaintiff has contended that officers' earlier conduct transgressed constitutional limits.[176]  And the Supreme Court has rejected an alternative rule.[177]

There is reason to question a rule that immunizes officers for the use of deadly force that, although it was reasonable in the moment, was prompted by the officers' own earlier reckless conduct.[178]  But the Court must apply the segmented approach, regardless of whether the Court

---

[172] *Id.* at 909 (quoting *Livermore ex rel. Rohm v. Lubelan*¸ 476 F.3d 397, 406 (6th Cir. 2007)). Plaintiff sought to file a sur-reply addressing the Defendants' citation to the segmented approach in their reply brief. Doc. 33. She argued that the Defendants had not raised this approach in their earlier briefing. *Id.* at 1–2. The Court denied that motion. Doc. 35. The Court notes here, however, that the "segmented approach" is not a new argument; it is how the Sixth Circuit has directed district courts to consider excessive force cases involving the use of deadly force. The Court would, therefore, have been obligated to use it regardless of whether the Defendants had raised it. Moreover, the Court has (out of an abundance of caution) reviewed Plaintiff's proposed sur-reply brief. Doc. 33-1. Nothing in that brief changes its conclusion in this case.

[173] *Chappell*, 585 F.3d at 909.

[174] *Id.*

[175] 101 F.3d 1151, 1161 (6th Cir. 1996) (quoting *Plakas v. Drinski*, 19 F.3d 1143, 1150 (7th Cir. 1994)).

[176] *Chappell*, 585 F.3d at 909.

[177] *County of L.A. v. Mendez*, 137 S. Ct. 1539 (2017).

[178] *See generally Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002) *abrogated by Mendez*, 137 S. Ct. 1539 (holding that an officer could be liable where (1) he "intentionally or recklessly provoke[d] a violent confrontation" and (2) "the provocation [was] an independent Fourth Amendment violation."). This sentence in the main opinion text is not meant

– 17 –

agrees with it.

As a result, the Court does not consider (for instance) whether Rhodes could have exited the Honda while it was stopped at the intersection of South Lake Shore and 222nd Street or whether Rhodes and Catalani should have left less space between their patrol vehicles on South Lake Shore so as to more effectively box Stewart's Honda in. It limits its analysis to the circumstances confronting Rhodes in the moment he used deadly force.

### The Use of Deadly Force

The question is whether, at the moment that Defendant Officer Rhodes used deadly force, Defendant Officer Rhodes had probable cause to believe that Stewart posed an imminent risk of serious physical harm to the officer or others. Probable cause amounts to a "fair probability" or "substantial chance" that a fact is true.[179]

In this case, Defendant Officer Rhodes had witnessed the Honda leave the roadway on two occasions.[180] And on one of those occasions the car came close to colliding with a telephone pole.[181] Officer Rhodes was not securely buckled into the passenger seat.[182] The car was not travelling at an unreasonable rate of speed,[183] but that is likely because Rhodes' struggle with Stewart over the gearshift prevented the car from remaining in drive for an extended period of time.[184] It is uncontested that Stewart was attempting to accelerate down the street, even though the car had stopped and was in neutral at the moment Rhodes shot Stewart.[185] The Honda had been travelling

---

to imply that Defendant Officer Rhodes' earlier conduct in this case was reckless in the *Billington* sense. As a result of the segmented approach, the Court need not and *does not* make any determination on that front and considers recklessness only in relation to the Plaintiff's Ohio state law claims in Section III.B. The Court only means to say here that in at least some cases the segmented approach shields officers from the legal consequences of their own dangerous recklessness and that the Court believes that approach may be unwise.

[179] *Cf. Illinois v. Gates*, 462 U.S. 213, 238, 243 n.13 (1983); *see also United States v. Poulsen*, 655 F.3d 492, 504 (6th Cir. 2011) ("The magistrate judge properly found probable cause. Certainty is not required, but rather a fair probability and something more than mere suspicion.").

[180] Doc. 15 at 166, 168; Doc. 14 at 151.

[181]; Doc. 14 at 151, 155.

[182] *See* Doc. 15 at 131, 167–68.

[183] Doc. 14 at 151.

[184] *See* Doc. 12-1 at 60.

[185] *Id.* at 60.

down a residential street at around the time many people begin heading to work.[186]  And Rhodes' prior attempts to stop the car—by gaining control of the gearshift and ignition, by tasing Stewart, and by striking him with the Taser and his fists—had proved ineffective.

Under these circumstances, Defendant Officer Rhodes had probable cause to believe that he was in danger of serious physical harm and that there was some similar risk to the public.  He was, therefore, justified in using deadly force.  It also seems to the Court that Officer Rhodes was justified in using deadly force to prevent himself from being kidnapped by Stewart.[187]

Admittedly, Officer Rhodes did not use all possible means of bringing the Honda to a stop. He did not, for instance, pull the emergency brake, use pepper spray, or use the drive-stun feature on his Taser.  But the ultimate question is not whether the officer exhausted every possible alternative before resorting to deadly force.[188]  It is whether there was probable cause to believe that deadly force was necessary to avoid a serious risk to the officer or others.  And in this case, the Court is not persuaded that there were viable alternatives to the use of deadly force.

Pulling the emergency brake might have brought the Honda to a swift stop.  But it also posed the risk of sending Officer Rhodes, who was not wearing a seatbelt, through the windshield.[189] Moreover, there is no reason that Stewart could not have disengaged the brake as easily as he was able to consistently put the car back into drive.  The brake and the gearshift were, after all, right next to each other.[190]

Using pepper spray in the enclosed passenger cabin of the Honda risked blinding Rhodes as

---

[186] Doc. 15 at 44, 203.  Defendant Officer Rhodes does not mention a concern for public safety in his deposition, focusing primarily on the danger to himself and a desire to stop the vehicle.  *Id.* at 167–71.  Plaintiff uses this to suggest that public safety concerns cannot justify the shooting.  *See* Doc. 22 at 11–13.  But it is not clear that is true.  Rhodes seems to have indicated to the BCI that he feared for public safety.  Doc. 12-1 at 62.  In any event, the test here is objective and not dependent upon Rhodes' actual subjective intent.  *Chappell,* 585 F.3d at 908.

[187] This may not have been Stewart's intention.  It may well be that he simply meant to flee.  But whether intentionally or not, Stewart was transporting Officer Rhodes against Rhodes' will to an unknown location.

[188] *Scott v. Edinburg,* 346 F.3d 752, 760 (7th Cir. 2003); 3 Wayne R. LaFave, *Search  & Seizure* § 5.1(d) (2017) ("[T]he Fourth Amendment does not require police to exhaust every alternative before using deadly force; the alternative must be reasonably likely to lead to apprehension before the suspect can cause further harm." (footnotes omitted)).

[189] *See* Doc. 15 at 131, 167–68.

[190] Doc. 14 at 189–90.

well as Stewart.[191]

Deploying the Taser's drive stun feature also seems unlikely to have made much difference. A Taser works by causing neuro muscular incapacitation, which immobilizes a person by causing involuntary stimulation of the sensory and motor nerves.[192] It does so by sending an electrical flow between the two probes launched from the Taser when it is fired.[193] The greater the distance between the probes, the more muscles that are effected and the greater the incapacitation.[194]

If the probes are not spread far enough, perhaps because the officer was not far enough from the subject when the Taser was fired, the Taser will not cause as much incapacitation and will mainly become a tool for causing pain compliance.[195] Put another way, if the probes are not spread out enough, they will cause pain but will not immobilize a suspect. Defendant Officer Rhodes testified that he suspects this is why the Taser did not work on Stewart: there was not enough space inside the Honda's passenger cabin for the probes to spread before contacting Stewart.[196]

All of this is relevant here because the drive stun feature is primarily a tool of pain compliance, much like the probes if there is not enough distance between them.[197] So if the probes did not work when operating as a pain compliance measure, one would suspect the drive stun feature would not work either. Or at least a reasonable officer in the midst of a wild ride with a suspect who refused to respond to blows to his head might conclude that.[198]

Plaintiff suggests that Officer Rhodes and/or Officer Catalani could have called for backup or asked that stop sticks be placed in front of the car.[199] Those options, however, would require other

---

[191] Doc. 15 at 150.
[192] User Manual at 5–6.
[193] *See id.* at 6.
[194] *See id.* at 6, 16.
[195] *Id.* at 16.
[196] Doc. 15 at 145–47.
[197] User Manual at 17.
[198] Defendant Officer Rhodes testified that he did not think to use the drive stun feature. Doc. 15 at 149. So all of this is somewhat speculative. The point is, though, that even if he had thought of it, it appears that it would not have been effective in stopping the Honda.
[199] *See* Doc. 22 at 10–11.

officers to overtake Stewart's vehicle, which would present a challenge even though the police station was nearby. Perhaps Officer Rhodes could have slowed Stewart down enough to allow for these options by continuing to struggle for the gearshift. But that would be asking Rhodes to gamble that nothing would happen between the time he called for backup or stop-sticks and the time they were deployed. Moreover, this analysis is the sort of speculative, hindsight-driven theorizing that the Sixth Circuit has directed district courts to avoid.[200]

The Court rejects the argument that Rhodes could simply have gotten out of the car while it was stopped after mounting the curb a second time. Police officers have no duty to retreat before using deadly force once a suspect puts them in a position where deadly force is justified.[201] Moreover, having witnessed Stewart quickly get the vehicle into drive multiple times, Officer Rhodes had little reason to believe that Stewart would not be able to get the car moving again between the time he stopped fighting for the gearshift and started attempting to exit the vehicle. Jumping on Stewart or grabbing for the steering wheel might have been even more dangerous if Stewart was able to get the car in gear again.

We now know, of course, that the Honda could no longer be shifted into drive and, thus, could no longer be moved forward.[202] But there is no evidence that Defendant Officer Rhodes knew that the vehicle was incapacitated. The Court must evaluate the use of deadly force from his perspective.[203]

Finally, it is true that (1) Stewart was not attempting to harm Rhodes in the Honda and (2) that some of Stewart's erratic driving may have been caused by Rhodes' attempts to gain control of the vehicle. The Court is not persuaded that these facts change the analysis. First, even if Stewart's actions *inside* the Honda did not necessarily put Officer Rhodes or others at risk of physical harm,

---

[200] *See Jones*, 4 F. Supp. 2d at 743–44.
[201] *See Nicholson v. Kent Cty. Sheriff's Dep't*, 839 F. Supp. 508, 516 (W.D. Mich. 1993).
[202] Doc. 12-1 at 88.
[203] *Jones*, 4 F. Supp. 2d at 743.

his refusal to stop *operating* the Honda did. And second, Officer Rhodes was not required to allow Stewart to transport him to another location without a struggle and the fact that the struggle put his life in danger justified the use of deadly force.

The Court is aware that the Ninth Circuit Court of Appeals has concluded that a constitutional violation did occur under similar circumstances.[204] But that decision is not binding on this Court and the Court is not persuaded by its reasoning. Faced with these circumstances, the Court is simply not sure what alternative course Officer Rhodes could safely have taken.

* * *

All fatal encounters between citizens and the police are tragedies on both a personal and societal level. And it is right that citizens should ask whether an officer-involved shooting was avoidable, including through the use of the legal system. Ultimately, though, in a § 1983 case, the question is not whether every action an officer took was wise or whether that officer made mistakes. Nor is the question whether the Court, in hindsight, can imagine a way in which the shooting could have been avoided.

The question is whether, under all of the circumstances facing the officer at the moment he pulled the trigger, there was probable cause to believe that the suspect posed a serious risk of physical harm to the officer or others. The Court finds that, even viewing the facts in the light most favorable to the Plaintiff, there was probable cause for such a belief in this case. It follows that Defendant Officer Rhodes's use of deadly force did not violate Stewart's Fourth Amendment rights.[205]

---

[204] *Gonzalez v. City of Anaheim*, 747 F.3d 789 (9th Cir. 2014) (en banc).

[205] Plaintiff's complaint mentions that her § 1983 claims are based upon violations of both the Fourth and Fourteenth Amendments. Doc. 1 at ¶ 32. To the extent this is meant to reflect the fact that the Fourth Amendment's guarantees are incorporated against the States by way of the Fourteenth Amendment's Due Process Clause, she is correct. *See generally Mapp v. Ohio*, 367 U.S. 643 (1961). To the extent that she is attempting to state a Due Process claim separate and distinct from the Fourth Amendment's guarantees, such a claim fails. *See Graham*, 490 U.S. at 395 ("*[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." (emphasis in original)).

### 3. Clearly Established

Having concluded that Defendant Officers Rhodes and Catalani did not violate Stewart's constitutional rights, the Court need not necessarily consider whether those rights were clearly established.[206] The Court declines to do so for Plaintiff's claims regarding the initial stop on South Lake Shore.

But whether Defendant Officer Rhodes' use of deadly force violated Stewart's constitutional rights was a much closer question. So (out of an abundance of caution) the Court considers whether, even assuming the use of deadly force was a constitutional violation, that violation was clearly established. The Court concludes that it was not.

The Sixth Circuit has held that "it is axiomatic that individuals have a clearly established right not to be shot absent 'probable cause to believe that [they] pose[ ] a threat of serious physical harm, either to the officer or to others.'"[207] But the Circuit has since recognized that Supreme Court precedent stops this Court from defining a right at such a high level of generality for qualified immunity purposes.[208]

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"[209] The Supreme Court has repeatedly told courts "not to define clearly established law at a high level of generality."[210] Instead, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'"[211]

---

[206] *See Hayden*, 640 F.3d at 153.

[207] *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Sample v. Bailey*, 409 F.3d 689, 698 (6th Cir. 2005) (second and third alterations in original).

[208] *See Latits*, 878 F.3d at 552–53. Ordinarily, the earlier decided case (*Mullins*) would control over the later case (*Latits*). *Sowards v. Loudon Cty*, 203 F.3d 426, 431 n.1 (6th Cir. 2000) ("When a later decision from this court conflicts with its prior decisions, the earlier cases control."). But the Supreme Court has further clarified its position between the time the Sixth Circuit decided *Mullins* and the time it decided *Latits*. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) ("Today, it is again necessary to reiterate the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" (quoting *al-Kidd*, 563 U.S. 731, 742 (2011))). The Court will abide by the Supreme Court's instructions.

[209] *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (per curiam) (quoting with alterations *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

[210] *al-Kidd*, 563 U.S. at 742.

[211] *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742) (emphasis in original).

While some cases may be obvious violations of constitutional rights and the law does not require a case that is "directly on point" to recognize a right as clearly established, "existing precedent must" nonetheless "have placed the statutory or constitutional question beyond debate."[212] "The precedent clearly establishing a right can be in the form of a case of 'controlling authority or a robust consensus of cases of persuasive authority.'"[213]

There is no such controlling authority or persuasive authority here.

Plaintiff points to cases like *Smith v. Cupp*[214] to attempt to show that Defendant Officer Rhodes' conduct here violated a clearly established right.[215] That case, however, is very different from the facts here.

In *Smith*, an officer detained a suspect in a restaurant parking lot, handcuffed him, and placed him in the backseat of a police cruiser.[216] The suspect somehow escaped his restraints and gained control of the cruiser while the officer was outside the vehicle.[217] He then drove the cruiser in the officer's direction, either in an attempt to hit the officer or in order to get out of the parking lot.[218] The officer shot the suspect multiple times as he passed.[219] The Sixth Circuit denied qualified immunity because a reasonable jury could find a constitutional violation.[220] It explained that a jury could find that the suspect was simply trying to escape and that the officer was outside the zone of danger when he fired.[221] The other controlling case Plaintiff cites is factually similar to *Smith*.[222]

This case, however, is very different. Defendant Officer Rhodes was not outside the Honda in a place of safety when he shot Stewart. He was inside the vehicle, struggling for control, as it

---

[212] *White*, 137 S. Ct. at 551 (quoting *Mullenix*, 136 S. Ct. at 308).
[213] *Latits*, 878 F.3d at 552 (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)).
[214] 430 F.3d 766 (6th Cir. 2005).
[215] Doc. 22 at 19–20 n.14, 21.
[216] 430 F.3d at 769.
[217] *Id.*
[218] *Id.* at 769–70.
[219] *Id.*
[220] *Id.* at 773–75.
[221] *See id.*
[222] *See Godawa v. Byrd*, 798 F.3d 457 (6th Cir. 2015).

travelled down a public roadway.

Indeed, the facts in *Latits v. Phillips*[223] were more similar to *Smith* than the facts in this case. In *Latits*, officers engaged in a high-speed chase with a suspect, eventually forcing his car off the road in violation of department policy.[224]  When the suspect's car stopped, officers pulled along either side.[225]  Another officer pulled in front of the suspect's car when he started to slowly move forward again.[226]  The officer who rammed the suspect off the road ran behind the suspect's car and shot the suspect when he began to reverse away from the cruisers that had boxed him in.[227]  Notwithstanding the factual similarities with *Smith*, the Sixth Circuit nonetheless held that the constitutional violation in *Latits* was not clearly established.[228]  This suggests that any constitutional violation in this case also was not clearly established, because the facts in this case are further afield of *Smith* than the facts in *Latits*.

Moreover, there are several decisions that, although persuasive rather than binding, could be read to suggest that Officer Rhodes' conduct was constitutionally permissible.  In those cases, an officer was being dragged along outside a vehicle by a suspect attempting to flee after a traffic stop.[229]

Again, this case is different:  Defendant Officer Rhodes was inside the vehicle and, thus, not in danger of being run over or dragged down the street at the time he shot Stewart.  But the fact remains that the facts of this case lie somewhere between the facts of *Smith* and the facts of the vehicle dragging cases.  That ambiguity precludes the alleged deadly force constitutional violation in this case from being clearly established.

Plaintiff points to two out-of-circuit cases, including the Ninth Circuit case discussed above,

---

[223] 878 F.3d 541.
[224] *Id.* at 544–46.
[225] *Id.* at 546.
[226] *Id.*
[227] *Id.*
[228] *Id.* at 552–53.
[229] *Jones*¸ 4 F. Supp. 2d 737; *Estate of Alexander v. Merrow*, No. 14-cv-11612, 2016 WL 1465011 (E.D. Mich. April 14, 2016) (*aff'd sub nom, Alexander v. County of Wayne*, 689 F. App'x. 441 (6th Cir. 2017)).

to support her position.[230]  But two persuasive cases do not establish the "robust consensus" of persuasive authority necessary to show that the alleged violation here was clearly established.[231]

For those reasons, the Court concludes that Defendant Officer Rhodes would be entitled to qualified immunity on Plaintiff's excessive force claim even if his use of deadly force violated Stewart's constitutional rights.

## B. State Law Claims Against the Individual Officers

Plaintiff also brings a variety of Ohio state-law claims against Defendant Officers Rhodes and Catalani.[232]  The Defendant Officers argue that they are immune from those claims under Ohio law.[233] The Court agrees.

Ohio law immunizes public employees from liability unless (1) "[t]he employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;" (2) those "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;"  or (3) "[c]ivil liability is expressly imposed upon the employee by" statute.[234]  Plaintiff contends that the second of these exemptions applies in this case.[235]

For the reasons (discussed in Section III.A) that the Court concluded that Officers Rhodes and Catalani did not violate Stewart's constitutional rights, the Court also concludes that the officers did not act with malicious purpose, in bad faith, or wantonly or recklessly within the meaning of Ohio law.  Officers Rhodes and Catalani acted reasonably in attempting to remove Stewart from his vehicle when he began to flee the scene.  And Officer Rhodes had probable cause to believe that he or others were in serious risk of physical injury when he shot and killed Stewart on 222nd Street.

The Court therefore concludes that the Officer Defendants are entitled to immunity from

---

[230] Doc. 22 at 19–20 n.14 (citing *Gonzalez*, 747 F.3d 789 and *Ford v. City of Pittsburgh*, No. 13-cv-1364, 2016 WL 4367994 (W.D. Pa. Aug. 15, 2016)).
[231] *Latits*, 878 F.3d at 552 (quoting *Plumhoff*, 134 S. Ct. at 2023).
[232] Doc. 1 at ¶¶ 50–69.
[233] Doc. 12 at 22-23.
[234] O.R.C. § 2744.03(A)(6).
[235] Doc. 22 at 24–25.

Plaintiff's Ohio state-law claims.[236]

## C. *Monell* Claim Against the City of Euclid

Finally, Plaintiff brings a *Monell* claim against Defendant City of Euclid, alleging that its practices or procedures led to the violation of Stewart's constitutional rights and his death.[237] Because the Court finds that Defendant Officers Rhodes and Catalani did not violate Stewart's constitutional rights, Plaintiff's *Monell* claim fails.[238]

The Court will note, though, that the City might have some difficulty surmounting Plaintiff's *Monell* claim if that were not the case. Of particular concern is the City's blasé attitude toward excessive force training. Other than whatever basics are taught to officers when they attend a police academy, the City's training seems to consist initially of simply reading the excessive force policy after advising officers to "pay attention."[239] The City then apparently follows that up with a barebones yearly test (which is the same every year) and yearly scenarios that each focus on a single genre of facts that might require the use of force.[240] But the City does not seem to make any serious effort to track which scenarios individual officers were exposed to or ensure that the scenarios (over the course of several years) cover a comprehensive range of instances that might require the use of force.[241]

Moreover, although the police department's training policy calls for a training committee to review training needs and set training objectives, the department apparently does not have such a committee.[242]

---

[236] The City of Euclid also asserts that it is entitled to immunity from Plaintiff's Ohio state-law claims. Doc. 12 at 20–22. But Plaintiff does not assert any state-law claims against the City of Euclid. *See generally* Doc. 1. Instead, she brings only a *Monell* claim against the City. The only claim that could possibly be interpreted otherwise is her survivorship claim, Doc. 1 at 66–69, but even that appears to be solely directed at the Officer Defendants. Out of an abundance of caution, however, the Court concludes that—to the extent Plaintiff's Ohio state-law claims are directed against the City of Euclid—the City is immune from those claims. *See* O.R.C. § 2744.02.

[237] Doc. 1 at ¶¶ 34–49.

[238] *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point."); *see also Peet v. City of Detroit*, 502 F.3d 557, 566 (6th Cir. 2007).

[239] Doc. 20 at 35–36; *see* Doc. 21 at 27, 42, 45–46; Doc. 37 at 14, 119–20.

[240] *Id.* at 28–32.

[241] *Id.* at 36–47; Doc. 21 at 33–37.

[242] *Id.* at 29; Doc. 12-1 at 35–36.

Lastly, the presentation materials used during at least one of the Euclid Police Department's in-service trainings display a disturbing tendency to trivialize the use of excessive force.[243]   For instance, one slide contains the following graphic showing an officer beating a prone and unarmed suspect with the caption "[p]rotecting and serving the poop out of you."[244]



Another slide, which expressly discusses the department's use of force policy, contains an image of two officers—one holding a shotgun, the other holding a pistol—with furious expressions on their faces.[245]   The caption on this slide reads: "Bed bug! Bed bug on my shoe!"[246]

Yet another slide contains a link to a Chris Rock comedy routine on YouTube entitled "How not to get your ass kicked by the police!"[247]   During the skit, Rock says:

- "People in the black community . . . often worry that we might be a victim of police brutality, so as a public service the Chris Rock Show proudly presents: this educational

---

[243] The Court **GRANTS** Plaintiff's motion to supplement her summary judgment briefing in light of Police Chief Scott Meyer's deposition, which could not be taken prior to the deadline for filing her opposition.  Doc. 38 at 1.
[244] Doc. 37-1 at 25; *see* Doc. 37 at 128–38.
[245] Doc. 37-1 at 49; *see* Doc. 37 at 128–38.
[246] Doc. 37-1 at 49; *see* Doc. 37 at 128–38.
[247] Doc. 37-1 at 41 (linking to https://www.youtube.com/watch?v=uj0mtxXEGE8).

video."[248]

- "Have you ever been face-to-face with a police officer and wondered: is he about to kick my ass?  Well wonder no more.  If you follow these easy tips, you'll be fine."[249]

- "We all know what happened to Rodney King, but Rodney wouldn't've got his ass kicked if he had just followed this simple tip.  When you see flashing police lights in your mirror, stop immediately.  Everybody knows, if the police have to come and get you, they're bringing an ass kicking with 'em."[250]

- "If you have to give a friend a ride, get a white friend.  A white friend can be the difference between a ticket and a bullet in ya'."[251]

The video also shows numerous clips of multiple officers beating suspects.[252]   Whatever the merits of this routine as comedy, it is grossly inappropriate in the context of a police department's use of force training.

To be clear, the Court does not find that the Department's dubiously supervised and organized excessive force training regimen or its tasteless, irresponsible frivolity with regard to the use of force would certainly support a *Monell* claim if Officers Rhodes and Catalani had violated Stewart's constitutional rights.  It mentions these facts to express its caution that the Euclid Police Department seems to view the use of force (including deadly force) with cavalier indifference and to suggest that the viability of a *Monell* claim would be a close question.

In this case, however, the lack of a constitutional violation precludes *Monell* liability.

### IV. CONCLUSION

For all of those reasons, the Court **GRANTS** the Defendants' motion for summary judgment

---

[248] InsaneNutter, *Chris Rock-How not to get your ass kicked by the police!* (Feb. 2, 2007), https://www.youtube.com/watch?v=uj0mtxXEGE8.

[249] *Id.*

[250] *Id.*

[251] *Id.*

[252] *Id.*

and orders that Plaintiff's complaint be **DISMISSED WITH PREJUDICE**.


      IT IS SO ORDERED.


Dated: July 13, 2018                 *s/       James S. Gwin*
                                      JAMES S. GWIN
                                        UNITED STATES DISTRICT JUDGE